**Thomas J. LANPHEAR, Appellant,**

v.

**Ruth T. PROKOP, Chairperson, Merit Systems Protection Board, et al.**

No. 82–1388.

United States Court of Appeals, District of Columbia Circuit.

Argued 12 Jan. 1983.

Decided 1 April 1983.

Joseph B. Scott, with whom Irving Kator, Washington, D.C., was on brief, for appellant.

John W. Polk, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Evangeline W. Swift, Gen. Counsel, and Sara B. Reardon, Atty., Merit Systems Protection Bd., Washington, D.C., were on brief, for appellees.

Before ROBINSON, Chief Judge, WILKEY and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Appellant Thomas Lanphear, a white male, complains of racial discrimination in federal employment in violation of Title VII of the Civil Rights Act of 1964.[1] Specifically, he claims that on account of his race he was removed from his position as Chief Appeals Officer of the Merit Systems Protection Board's Washington Field Office and thereafter denied reappointment to that post on two occasions.[2] The district court dismissed appellant's suit following a bench trial finding that there was a legitimate, nondiscriminatory reason for these personnel actions. We now reverse and remand with instructions to enter judgment for the appellant and to award him appropriate relief.

## I. BACKGROUND

Appellant was employed for over eight years by the now defunct Civil Service

Commission (CSC). He performed a variety of legal and administrative tasks before being competitively appointed on 1 May 1978 as Chief Appeals Officer (CAO) of the Washington Field Office, a GS–15 position. He inherited a difficult situation there and apparently did much to improve it. He substantially reduced a large backlog of cases, increased the administrative efficiency of the office, and bolstered a sagging morale. He received solid, even enthusiastic evaluations from his immediate supervisors.[3]

In January 1979 the adjudicatory functions of CSC were taken over by the newly created Merit Systems Protection Board (MSPB) while its management functions were largely shifted to the Office of Personnel Management. CSC employees were transferred to the new agency in a "mass change" document according to which their title, grade, and salary remained the same.[4] Thus, appellant continued to serve as CAO in the Washington Field Office. In August of that year, however, the MSPB published a vacancy announcement for CAO positions within the agency.[5] The announcement stated that appointments would be made "as vacancies occur," but the MSPB treated the announcement as including all CAO positions, of which there were eleven. Appellant was, thus, reduced to acting CAO and had to hope for reappointment under the new regime.

In February 1980, before the new CAOs were selected, Ruth Prokop, chairwoman of the MSPB, issued an affirmative action mandate directing her subordinates to achieve a representative workforce. "I am committed to this result," she stressed.

---

1. *As amended,* 42 U.S.C. §§ 2000e–2000e–17 (1976).

2. At trial appellant also claimed that his nonselection was in retaliation for recommending that a black employee in his office be promoted. That claim was rejected by the district court and has been dropped by appellant.

3. Evaluation of Employee Performance for Thomas Lanphear (Feb. 1979); Supervisory

Appraisal for Thomas Lanphear (Oct. 1979); Applicant Appraisal Form for Thomas Lanphear (May 1980), *reprinted in* Joint Appendix (JA) at 47–53.

4. *Reprinted in* JA at 54.

5. Vacancy Announcement 79–34 (20 Aug. 1979), *reprinted in* JA at 41.

Thus, your performance in this area will be measured by the degree that you successfully achieve the Board's goals in the organizational unit for which you are responsible.[6]

Also during the pendency of the CAO selection procedures, the MSPB was developing an official affirmative action plan which called for hiring a black male CAO in the 3rd quarter of fiscal year 1980.[7]

Appellant Lanphear was advised by his supervisor, Paul Mahoney, that he would automatically be considered for the CAO position in the Washington Field Office and need not submit an application. In fact, however, he appears not to have received any consideration, whether serious or perfunctory. No papers concerning him, not even supervisory appraisals, were given to the reviewing panel that screened candidates. He was not interviewed for the job by Mr. Redenius, the man ultimately responsible for the selection. He never even received notice of his non-selection, learning of it only indirectly through rumors; through broad hints by Redenius, who suggested he take another job but allegedly refused to confirm that he would not be reappointed as CAO; and finally through a March 1980 newsletter announcing that Samual Flanagan, a black attorney from the Department of Justice, had been selected. One month later appellant was reassigned to the Office of Appeals at MSPB headquarters. His grade and salary remained the same.

Mr. Flanagan was chosen in an abbreviated process. Despite their alleged importance to selection, Redenius did not review Flanagan's supervisory appraisals or any of his work product. Nor did he speak with any of the members of the screening panel about Flanagan's qualifications. Redenius chose him only on the basis of his standard form application, his resume and a personal interview.[8]

Later that year the CAO position was upgraded from GS–15 to the Senior Executive Service. A new vacancy announcement was published[9] and both Flanagan and appellant applied for the position. Both candidates were considered by the rating panel to be highly qualified. Redenius was again the selecting official and he again chose Flanagan.

After his first failure to be reappointed as CAO of the Washington Field Office, appellant filed a complaint with the MSPB's Equal Employment Opportunity (EEO) office alleging that his non-selection was due to his race. An EEO counselor assigned to the case noted a number of reasons given by Redenius for not selecting appellant: management deficiencies leading to personnel complaints; a large backlog, including a number of unassigned cases; and sloppy, erratic production. In sum, appellant "was not up to the standards" of the job.[10] Redenius also stated that he had not needed to interview appellant since he was already well aware of appellant's deficiencies.

On 5 February, despite Redenius' claims, the EEO office issued a recommended deci-

6. Order from Ruth Prokop to All Supervisors and Managers (6 Feb. 1980), *reprinted in* JA at 179.

7. Affirmative Action Plan for Fiscal Year 1980 at 37, *reprinted in* JA at 172, 212. *See also* Testimony of Mr. Doheny, *reprinted in* Trial Transcript (TR) at 947 (even before selection was made "there was a consensus on the staff that we would probably have a black Chief Appeals Officer").

8. Stipulations of Fact (No. 81–0927) at ¶ 14, *reprinted in* JA at 32; Supplemental Stipulations at ¶ 1, *reprinted in* JA at 39. The above remarks are not intended to cast aspersions on Flanagan's qualifications, which were indisput-

ably good. But a departure from the normal consideration given a candidate is evidence that, at least in Redenius' mind, the candidate's qualifications for the job were not the only factors to be considered. This evidence is highly relevant to the question whether the reason given for not hiring appellant, *i.e.,* his comparative lack of qualifications, was merely a pretext.

9. Vacancy Announcement 80–SES–5, *reprinted in* JA at 344.

10. EEO Counselor's Report re Thomas Lanphear (*hereinafter cited as* EEO Report) at 4, *reprinted in* JA at 65, 68.

sion finding reasonable cause to believe plaintiff was discriminated against because of his race.[11] The MSPB refused to accept this recommendation. Appellant filed a second complaint after he was again passed over for the CAO position. When this complaint was also rejected by the MSPB, appellant brought the present action.

The district court, after a week-long trial, dismissed appellant's suit. Although recognizing that appellant had established a prima facie case of race discrimination, the court nonetheless concluded that the MSPB had a legitimate reason for eliminating appellant from consideration: "they had concluded prior to the 1980 selection of CAOs that they wanted new faces and they wanted to remove most if not all of the incumbents."[12]

## II. ANALYSIS

### A. Legal Framework of Title VII Discrimination Cases

In *McDonnell Douglas Corp. v. Green*,[13] the Supreme Court set forth the basic allocation of burdens and order of presentation of proof in a Title VII discrimination case. First, plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence. Second, if plaintiff succeeds in proving this prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."[14] Third, if defendant carries this burden, plaintiff is then granted an opportunity to prove by a preponderance of the evidence that the facially legitimate reason offered by the defendant was not its true reason, but rather a pretext for discrimination.[15]

The importance of these shifting burdens was reemphasized by the Court in the recent case of *Texas Dept. of Community Affairs v. Burdine*.[16] Plaintiff always bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him. "The *McDonnell Douglas* division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question."[17]

In *McDonnell Douglas* the Court also outlined a model prima facie case of discrimination. Plaintiff must show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications.[18]

The Court added, however, that this standard is not inflexible since "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect in differing factual situations."[19] The *Burdine* Court, acting on this suggestion, explained the prima facie case in a much more flexible manner: plaintiff must merely prove that he applied for an available position for which he was qualified, but "was rejected under circumstances which give rise to an inference of unlawful discrimination."[20]

■ Title VII prohibits discrimination against white males upon the same standards that it prohibits discrimination

11. *See* Complaint at 5, *reprinted in* JA at 10; Answer at 7, *reprinted in* JA at 18.

12. Memorandum Opinion, No. 81–0927, at 8 (D.D.C. 24 March 1982), *reprinted in* JA at 20, 27.

13. 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973).

14. *Id.* at 802, 93 S.Ct. at 1824.

15. *Id.* at 804, 93 S.Ct. at 1825.

16. 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

17. *Id.* at 253, 101 S.Ct. at 1093.

18. 411 U.S. at 802, 93 S.Ct. at 1824.

19. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13.

20. 450 U.S. at 253, 101 S.Ct. at 1093.

against members of a racial minority.[21] In other words, a plaintiff's ultimate burden of persuasion remains the same regardless of race: he must prove that the defendant intentionally discriminated against him. Yet this court has recognized that some adjustment is necessary in the prima facie case required of a white male.

The original *McDonnell Douglas* standard required the plaintiff to show 'that he belongs to a racial minority.' Membership in a socially disfavored group was the assumption on which the entire *McDonnell Douglas* analysis was predicated, for only in that context can it be stated as a general rule that the 'light of common experience' would lead a factfinder to infer discriminatory motive from the unexplained hiring of an outsider rather than a group member. Whites are also a protected group under Title VII, but it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society.[22]

Thus, to establish a prima facie case appellant needs to show more than that he was qualified for the CAO position but was rejected in favor of a black male from outside MSPB. He must also show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority."[23] In other words, to repeat the *Burdine* formulation, he must show that he "was rejected under circumstances which [despite his majority status] give rise to an inference of unlawful discrimination."[24]

## B. *The District Court's Opinion*

The district court found that appellant "easily established his prima facie case."[25] We agree. He was amply qualified for the CAO position. Indeed, he had been filling it for some time with good results. Furthermore, he presented evidence that once the MSPB demoted him to acting CAO "he was given little or no consideration for the position,"[26] and was passed over in favor of a black male from outside the agency whose qualifications were not fully reviewed by the selecting official. Finally, at the time of selection the MSPB was under pressure from its head to increase the percentage of minority employees and was in the process of adopting an affirmative action plan.[27] These elements combine to make out a prima facie case of race discrimination against a white employee.

Once appellant established his prima facie case, the burden shifted to the MSPB to articulate a legitimate, nondiscriminatory reason for its treatment of appellant. The reason given by the MSPB was that appellant was not up to the standards of the job: he had performed poorly as CAO and was accountable for personnel and production problems in the Washington Field Office. This is the reason Redenius gave to the EEO investigator.[28] It is the reason

**21.** *McDonald v. Sante Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976).

**22.** *Parker v. Baltimore & O.R. Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981).

**23.** *Id. See also Daye v. Harris,* 655 F.2d 258, 263 (D.C.Cir.1981).

**24.** 450 U.S. at 253, 101 S.Ct. at 1093.

**25.** Mem.Op. at 2, *reprinted in* JA at 21.

**26.** *Id.*

**27.** The Supreme Court has held that Title VII does not prohibit "race-conscious affirmative action plans." *United Steelworkers of America v. Weber,* 443 U.S. 193, 197, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979) (approving direct quota allowing junior black employees to advance over white employees with seniority). But the Court declined to "define in detail the line of demarcation between permissible and impermissible affirmative actions plans." *Id.* at 208, 99 S.Ct. at 2729. Nor need we attempt such a task today. The MSPB has not purported at any point in the proceedings to justify its actions on the basis of an affirmative action plan. Under both *McDonnell Douglas* and *Burdine* an employer is held to the reason it articulates for rejecting an employee. If that reason proves pretextual, a court is not to substitute an alternative justification of its own accord. *See* pp. 1316–1317, *infra.*

**28.** *See* p. 1313, *supra.*

given in the MSPB's Answer to the original Complaint.[29] It is the focus of the MSPB's defense as presented to the trial court below.[30] And it is reiterated in the argument made to this court.[31]

There can be no doubt that "poor performance" was the response given by the MSPB when it was required, under the shifting burdens of *McDonnell Douglas*, "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." [32] Appellant devoted his energies at trial to rebutting this defense in an effort to show that it was merely a pretext for discrimination. The ultimate issues in the case were thereby brought clearly into focus. Yet the district court inexplicably granted judgment for the MSPB on a ground totally different from that upon which the MSPB relied.

> The defendants did not single out plaintiff as a means of selecting a black; rather, they had concluded prior to the 1980 selection of CAOs that they wanted new faces and they wanted to remove most if not all of the incumbents.[33]

The district court found that the MSPB simply wanted "to inject new blood into the agency" by means of a "change in personnel" among holdover CAOs.[34]

The entire basis for this "clean sweep" justification presented by the district court appears to stem from a stray suggestion made to Redenius by another MSPB official who did not even take part in the selection process.[35] He suggested that because of public image problems it might be best "to replace all the staff members who were the key figures," including CAOs.[36] There is no indication that this suggestion was followed. Indeed, two of the five holdover CAOs were reappointed. More important, Mr. Redenius, the selecting official, never offered it as a reason for not selecting appellant. Nor was it ever put forward as a justification by the MSPB, either before this court or below. In fact, the MSPB has explicitly disavowed it.[37]

The district court's substitution of a reason of its own devising for that proffered by appellees runs directly counter to the shifting allocation of burdens worked out by the Supreme Court in *McDonnell Douglas* and *Burdine.* The purpose of that allocation is to focus the issues and provide plaintiff with "a full and fair opportunity" to attack the defendant's purported justification. That purpose is defeated if defendant is allowed to present a moving target or, as in this case, conceal the target altogether.

> [T]he defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the

strong points so much as appellant's deficiencies.

---

**29.**  *See* Answer at ¶¶ 18 & 20, *reprinted in* JA at 17.

**30.**  *See* Testimony of Mr. Redenius, *reprinted in* TR at 459–460, 505–510.

**31.**  *See* Brief for Appellees at 12.

**32.**  411 U.S. at 802, 93 S.Ct. at 1824. A related justification presented by the MSPB is that Flanagan was better qualified than appellant. In other words, appellant is said to have been unqualified for the CAO position both absolutely *and* relative to his successor. But the argument for the latter point turns largely on evidence presented to establish the former. That is, the MSPB does not emphasize Flanagan's

**33.**  Mem.Op. at 8, *reprinted in* JA at 27.

**34.**  *Id.* at 8–9, *reprinted in* JA at 27–28.

**35.**  Testimony of Mr. Mahoney, *reprinted in* TR at 691 ("We were not brought into these consultations to any great degree and we sort of were left out, wondering what was going to happen.").

**36.**  *Id.* at 593. *See also id.* at 640.

**37.**  Brief for Appellees at 24–25.

action and *to frame the issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.*[38]

The Supreme Court explicitly added that "[a]n articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel."[39] It should not be necessary to add that the defendant cannot meet its burden by means of a justification articulated for the first time in the district court's opinion.

Accordingly, the judgment of the district court cannot be sustained.

## C. *The Question at Issue*

██ The focus of this case is now on a single issue: Was appellant's poor performance as CAO the real reason for the MSPB's treatment of him?[40] If true, appellant's case is defeated and judgment must be for the MSPB. If, however, appellant shows that reason to be specious, then in conjunction with his prima facie case appellant has carried his burden of proving discrimination by a preponderance of the evidence.

There is no need to remand to the district court to resolve this issue. It is clear from the record and even from the district court's opinion that appellant did not perform poorly as CAO.[41] In fact, his performance was good, perhaps excellent, and he met all the standards and objectives of the job. Therefore, poor performance could not have been the reason for his nonselection. Since any other finding would be clearly erroneous, a remand on the issue would serve no purpose.[42]

As noted, Redenius gave three reasons why he considered appellant to be "not up to the standards" of the CAO position.[43] All three reasons have been decisively refuted by the evidence in the case. Indeed, the Stipulations of Fact alone, stipulations voluntarily entered into by the MSPB, are sufficient to undermine most of Redenius' claims.

First, Redenius asserted that "Lanphear did not handle people well and alienated his entire workforce."[44] He cited a number of management problems and Equal Employment Opportunity (EEO) complaints filed against appellant. "Redenius alleged that there were more problems in that unit in 1979 than in the rest of the organization."[45]

---

**38.** 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

**39.** *Id.* at 255 n. 9, 101 S.Ct. at 1094 n. 9 (emphasis added). *See also SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (administrative agency must defend its decision in court on the same basis as it gave for the decision itself).

**40.** As noted, the MSPB claims not only that appellant was unqualified for the CAO position but also that his successor was qualified. There appears to be little doubt that at the time of the first selection process the latter statement was true. Flanagan's paper record made him a plausible candidate for a CAO post and on the basis of that record he successfully passed the initial screening panel. Furthermore, Redenius testified that Flanagan was impressive and articulate in the personal interview preceding his selection. Testimony of Mr. Redenius, *reprinted in* TR at 550. But in order to establish pretext appellant need not show that Flanagan was unqualified. He need only show that he himself, contrary to the MSPB's assertions, was fully qualified. As we shall see, he demonstrates this with ease. Appellant's position is then further bolstered by evi-

dence that, at the time of the first selection, Redenius did not fully review Flanagan's qualifications, *see* p. 1313, *supra,* and that, at the time of the second selection, Redenius ignored indications that Flanagan himself had performed poorly as CAO, *see* pp. 1317–1318, & n. 65, *infra.*

**41.** The district court failed to identify this issue as the crux of the case and therefore failed to make any specific finding on it. But it is clear from remarks scattered throughout the opinion that the district court implicitly found that appellant did not perform poorly as CAO. *See, e.g.,* Mem.Op. at 4, 5, and 9, *reprinted in* JA at 23, 24, and 28.

**42.** *Independent Bankers Assoc. v. Heimann,* 613 F.2d 1164, 1167 (D.C.Cir.1979).

**43.** *See* note 10, *supra;* Testimony of Mr. Redenius, *reprinted in* TR at 505–510.

**44.** EEO Report at 4, *reprinted in* JA at 68.

**45.** *Id. See also* Testimony of Mr. Redenius, *reprinted in* TR at 510.

These allegations are simply not borne out by the Record Evidence. A number of witnesses testified and the trial court found that appellant was a well-regarded and "a popular CAO."[46] All his performance evaluations rated him as either "excellent" or "very good" in management ability.[47] A number of witnesses who had worked for both Lanphear and Flanagan "all spoke highly of the plaintiff and described him as being more knowledgable in the field and a much better administrator than Flanagan."[48] Furthermore, the parties stipulated that during his 23-month tenure as CAO only two formal EEO complaints were filed by WFO personnel.[49] In both instances the actions of which his subordinates complained were taken by appellant's superiors contrary to his recommendations.[50] Indeed, the major incident relied on by the MSPB to illustrate appellant's allegedly poor management is his promotion recommendation for one of these two employees. It is paradoxical to say the least to blame appellant both for his recommendation that the employee be promoted and for the EEO complaint filed by that employee when he was not promoted,[51] especially since that complaint was subsequently settled by granting the employee the promotion retroactively with back pay.[52] Furthermore, this promotion recommendation was the only one of eleven he made as CAO that was not approved.[53] The degree to which the MSPB harps on this single incident merely highlights the weakness of its defense.

Redenius' second reason was "the large backlog that still existed in the Washington Field Office as well as the number of unassigned cases."[54] But the parties have stipulated that appellant "substantially reduced" this backlog during his tenure as CAO.[55] There were 706 cases pending at the time of his appointment and only 174 cases pending when he was removed. 2419 final cases were produced in the interim. By contrast, during the nine months following appellant's removal, while Flanagan was CAO, the backlog of cases *increased* by almost 300 to 471.[56] Furthermore, unrebutted testimony shows that appellant made case assignments on a prompt basis and at no time had any unassigned cases.[57]

The parties also stipulated that "[e]ach CAO operated under a performance appraisal plan with a critical element providing that he or she 'organizes efforts of staff and office systems to maintain timely production at minimized cost.' The performance standard under that element required that '95% of field office decisions [be] issued within 120 days.'"[58] Appellant easily met this "critical" standard. During his tenure less than four percent of the applicable cases exceeded the 120-day limitation.[59] The MSPB simply offers no reason to doubt

**46.** Mem.Op. at 9, *reprinted in* JA at 28. *See* Testimony of Ms. Bogle, *reprinted in* TR at 385–86; Testimony of Ms. Johnston, TR at 750–751; Testimony of Mr. Richardson, TR at 767; Testimony of Ms. Gibson, TR at 799–800; Testimony of Mr. Hoxey, TR at 805; Testimony of Mr. Clancy, TR at 921; Testimony of Mr. Doheny, TR at 939.

**47.** *Reprinted in* JA at 47–53.

**48.** Mem.Op. at 9, *reprinted in* JA at 28. *See* note 46, *supra*.

**49.** Stipulations at ¶ 30, *reprinted in* JA at 33.

**50.** *Id.*

**51.** The MSPB has alleged that the fact that the employee in question was not ready for promotion was due to appellant's failure to provide sufficient guidance and counseling as to that employee's deficiencies. Brief for Appellees at 11. But that allegation is belied by the testimony of the employee who stated that appellant carefully discussed with him and critiqued each of his cases. Testimony of Mr. Tape, *reprinted in* TR at 324.

**52.** *Id.* at 326.

**53.** Stipulations at ¶ 23, *reprinted in* JA at 33.

**54.** EEO Report at 4, *reprinted in* JA at 68.

**55.** Stipulations at ¶ 4, *reprinted in* JA at 30.

**56.** *Id.* at ¶¶ 2, 4, 5, 15, *reprinted in* JA at 30–32.

**57.** Testimony of Ms. Johnston, *reprinted in* TR at 754.

**58.** Stipulations at ¶ 7, *reprinted in* JA at 31.

**59.** Supplemental Stipulations at ¶ 2, *reprinted in* JA at 39.

the appraisal of appellant's supervisor that he "performed extremely well in an office with a very heavy workload and many unusual and difficult cases." [60]

The final reason offered by Redenius in support of his contention that appellant was a poor CAO was that appellant's work product was "sloppy" and "erratic." [61] But this claim is belied by those directly responsible for supervising appellant. He constantly received the highest ratings for his work product, for his judgment and problem solving ability, for his writing skills and for his knowledge of the law and of investigative methods.[62] Nowhere in the Record does MSPB attempt to contradict these appraisals. Furthermore, as already noted, witnesses who worked for both men testified that appellant was more knowledgable in the field than his successor.

Only one conclusion is possible from the evidence. The MSPB's treatment of appellant did not stem from his poor performance as CAO. Yet this was the only justification offered by the MSPB in the face of appellant's prima facie case of discrimination.

### D. Conclusion

The district court characterized the initial CAO selection procedure as "unusual." [63] The term seems mild for the disregard shown and misrepresentations made to appellant,[64] especially in light of his long, dedicated service to the agency. The second selection process, when the CAO position was upgraded to the Senior Executive Service, was found to be "pro forma," with no attention paid to evidence that appellant

had performed better as CAO than his successor.[65] With respect to both selection procedures, appellant has demonstrated by a preponderance of the evidence that he was a victim of discrimination in violation of Title VII.

The judgment of the district court is reversed and the case is remanded with instructions to enter judgment for the appellant Thomas Lanphear and to award him appropriate relief.

*So ordered.*

---

60. Evaluation of Employee Performance for Thomas Lanphear (Feb. 1979) at 4, *reprinted in* JA at 47, 50.

61. EEO Report at 4, *reprinted in* JA at 68.

62. *See* note 3, *supra.*

63. Mem.Op. at 8, *reprinted in* JA at 27.

64. Mem.Op. at 2–3, *reprinted in* JA at 21–22 ("The plaintiff also presented evidence that he was never advised that he was in an 'acting' status until Nov. 1979 and he never received formal written notification of the change in his status. His attempts to ascertain his exact

status were frustrated by his superiors and he was advised that he had nothing to worry about.") *See also id.* at 7, *reprinted in* JA at 26.

65. *Id.* at 9, *reprinted in* JA at 28. A Confidential Field Office Evaluation Visit, *reprinted in* JA at 105–120, dated shortly before Flanagan's appointment to the Senior Executive Service became effective, revealed a wide variety of deficiencies in his performance as CAO. In fact, of six listed responsibilities, Flanagan was found to have accomplished only one.