# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 24, 2006         Decided May 19, 2006

No. 05-7044

BRIAN A. MASTRO,
APPELLANT

v.

POTOMAC ELECTRIC POWER COMPANY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01865)

*Charles W. Day, Jr.* argued the cause for appellant. With him on the briefs was *Joseph D. Gebhardt*.

*James P. Gillece, Jr.* argued the cause and filed the brief for appellee.

Before: GINSBURG, *Chief Judge*, and ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: After he was terminated for a

purported lack of candor, Appellant Brian Mastro filed suit against his employer, Potomac Electric Power Company (Pepco), and two supervisors (collectively, Appellees), alleging (1) discrimination in violation of Title VII of the Civil Rights Act of 1964 and (2) defamation. The district court granted summary judgment to Appellees. We affirm the district court's decision with respect to the defamation claims; however, we disagree with the court's determination that Mastro failed to demonstrate a prima facie case of reverse discrimination and ultimately conclude he raised a genuine issue of material fact concerning the legitimacy of Pepco's nondiscriminatory reason for his termination, specifically, whether it was due to a lack of candor, as Appellees contend, or to discrimination, as Mastro asserts. Accordingly, we reverse and remand Mastro's discrimination claim for further proceedings.

I

Brian Mastro, a Caucasian, began working for Pepco in 1989 as a system engineer. He was promoted in 1996 and served as Distribution Project Engineer, Underground High Voltage at the time of the events giving rise to this litigation. Prior to the episode central to this case, Pepco had never disciplined Mastro, and his supervisors had no reason to question his honesty.

One of the people Mastro supervised was a probationary employee, Donald Harsley, an African-American who had worked at Pepco for less than a year. On Sunday, February 17, 2002, Harsley was arrested and jailed after he confronted an ex-girlfriend and threatened to kill her and burn down her home and place of employment. As a result, he was absent from work beginning Tuesday, February 19, through Friday,

February 22.[1]  He returned to work the following Monday, February 25.

The date Mastro learned Harsley was actually in jail is the crux of the dispute that eventually led to Mastro's termination. Harsley claims he was always candid about his circumstances. He maintains he left a phone message for Mastro on the evening of Monday, February 18, requesting two days of vacation because he was in jail.  He also claims he spoke to Mastro on the evenings of Tuesday, February 19, and Wednesday, February 20, telling Mastro that he was still incarcerated and needed more vacation time, which Mastro granted.

Mastro, in contrast, contends he was unaware Harsley was in jail until Wednesday afternoon or Thursday morning of that week.  According to Mastro, he initially received a phone call from Harsley's girlfriend on Tuesday asking if Harsley could receive vacation time.  Mastro insisted Harsley must personally request vacation time, and later that evening, Harsley called, explaining that he had been arrested for "family problems" and needed time off to resolve the matter. Mastro says that though he approved the vacation, he did not know at the time that Harsley was in jail; he did not ask about it, nor did he have reason to suspect as much.  He maintains he only learned of Harsley's incarceration during another phone call with Harsley that took place on either the afternoon of Wednesday, February 20, or the morning of Thursday, February 21.  During that subsequent call, Mastro, acting on workplace rumors, asked Harsley if he was in jail, which Harsley admitted.  It is undisputed that on Thursday, February 21, Mastro informed his supervisor, Sunil Pancholi, who is of East Indian descent, that Harsley was incarcerated.

---

[1]  Monday, February 18 was the President's Day holiday, and Harsley was not required to be at work that day.

Pepco initially planned to fire Harsley for lying to Mastro, his supervisor, about his whereabouts when he asked for vacation time. At a meeting with Harsley and his union representatives in early April, however, company officials reconsidered after Harsley described his version of events and claimed that Mastro had always known Harsley's whereabouts when he granted the vacation time. James Bryant, an African-American employee who was one of Mastro's "lead" men (that is, second-in-command) and kept the timesheets for Mastro's team, was called into the meeting. Bryant stated that on the morning of Tuesday, February 19, Mastro had told him to mark Harsley down for vacation because Harsley was incarcerated.

Because the information revealed at the meeting appeared to contradict Mastro's earlier representations, Pepco launched an internal investigation, headed by David Duarte, an African-American employed as a Senior Employee Relations Investigator with Pepco, to determine who, if anyone, had been untruthful. Duarte spoke to Harsley, who stuck to the story that he had notified Mastro on Monday, February 18th, that he was in jail and needed vacation. Duarte also spoke with Bryant, the timekeeper, who repeated his statement regarding Mastro's purported knowledge of Harsley's incarceration on Tuesday, February 19th. Duarte interviewed a third employee, Jose Smith, who said that on Tuesday, February 19, Mastro had asked him if he knew Harsley's girlfriend's phone number. According to Smith, Mastro explained that he needed to get in touch with her because he had received a phone message from Harsley indicating Harsley was in jail, but he had no way to contact Harsley. While Duarte was conducting his investigation, Pancholi held a meeting with Mastro, which Duarte attended, to explain to Mastro the contradictory accounts and to hear Mastro's side of the story. Mastro contin-

ued to insist that he was unaware of Harsley's incarceration until later in the week in question, and, following the meeting, he provided a written account of his version of events.

Pepco officials ultimately concluded that Mastro had not been truthful. On May 10, 2002, Pancholi issued a memorandum to Mastro placing him on crisis suspension due to "serious/major incidents of lack of candor and a serious/major incident of unsatisfactory performance." The memorandum informed Mastro that his discharge was warranted and requested his presence at a May 14 meeting to discuss his future employment. At that meeting, Mastro persisted in maintaining his innocence. Immediately afterward, Pancholi, Duarte, and another Pepco official decided that, barring any new findings in the following week, Mastro would be terminated. Further investigation failed to uncover any new information, and on May 20, Pancholi issued Mastro a memorandum terminating his employment for the same reasons stated in the May 10 memorandum.[2] The memoranda documenting Mastro's termination were circulated to certain members of Pepco's management and Employee Relations Department and to the District of Columbia Department of Employment Services.[3]

---

[2] As for Harsley, Pepco officials concluded that he had been truthful, but they extended his probationary employment status to eighteen months for unexcused absences stemming from his time in jail.

[3] Pepco officials transmitted the memoranda to the D.C. Department of Employment Services pursuant to the government's "Request for Separation Information" following Mastro's application for unemployment benefits. District of Columbia law places additional conditions for the receipt of benefits on "any individual who has been discharged for gross misconduct occurring in his most recent work." D.C. Code § 51-110(b)(1).

Mastro initially filed a defamation suit against Pepco, Pancholi, and Duarte in the District of Columbia Superior Court and a discrimination suit against the same defendants in the United States District Court for the District of Columbia. The claims were eventually consolidated in the district court. Mastro's second amended complaint alleges one count of discriminatory termination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and two counts of defamation based on purportedly improper publication of the May 10 and May 20 memoranda (collectively, the termination memoranda). Appellees moved for summary judgment on all counts, which the district court granted. *Mastro v. Pepco*, 398 F. Supp. 2d 67, 78 (D.D.C. 2005). On the discrimination count, the district court concluded Mastro had failed to establish a prima facie case of discrimination because, first, he had not established sufficient "background circumstances" suggesting Appellees tended to discriminate against white employees; and, second, he did not produce evidence that he was replaced by someone outside his protected class or that similarly situated persons outside of his class were retained. *Id.* at 76. On the defamation counts, the district court concluded Mastro failed to produce evidence that Appellees published the termination memoranda outside the scope of applicable privileges. *Id.* at 78. Mastro timely appealed.

## II

We review the district court's grant of summary judgment de novo. *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). We will affirm only if no reasonable jury could find in favor of the nonmoving party. *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005).

A

We begin with Mastro's discrimination claim. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The protections of Title VII apply to minority and nonminority employees alike. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976). "The emphasis of both the language and the legislative history of the statute is on eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71 (1977). "This is true regardless of whether the discrimination is directed against majorities or minorities." *Id.* at 71-72.

Where, as here, a plaintiff produces no direct evidence of discrimination, we analyze a Title VII claim under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), initially placing the burden on the plaintiff to establish a prima facie case of discrimination, *id.* at 802; shifting it to the defendant employer "to articulate

some legitimate, non-discriminatory reason" for the employment action, *id.*; and shifting it back to the plaintiff to prove by a preponderance of the evidence that the proffered reasons are a pretext for discrimination, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The district court employed a four-part framework to assess the prima facie case, requiring a plaintiff to show (1) membership in a protected class; (2) performance at or near the level legitimately expected by the employer; (3) discharge; and (4) replacement by a person outside the protected class or retention of similarly situated individuals outside the protected class. *Mastro*, 398 F. Supp. 2d at 74 (quoting *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 5 (D.D.C. 2000) (citing *Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12, 17 (D.D.C. 1999))). This is not a correct statement of the law. "We have made clear that a plaintiff makes out a prima facie case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (quoting *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999))) (internal quotation marks omitted). A plaintiff may satisfy the third prong of this test by "demonstrating that she was treated differently from similarly situated employees who are not part of the protected class," *id.* (citing *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)), or, in the specific context of a discharge claim, showing that she was not terminated for "the two . . . common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether," *id.* Contrary to the district court's view, we have expressly rejected as

immaterial a requirement that the plaintiff be replaced by an individual outside her protected class. *Id.* at 412-13; *Stella*, 284 F.3d at 146. The plaintiff need only show that the position continues to exist and was filled—sufficient proof that the position was not simply eliminated.

In the context of reverse discrimination claims, the prima facie framework is tweaked once more. In the standard Title VII case, that is, where the plaintiff is a member of a minority group, an inference of discrimination arises when the employer merely carries out an adverse employment action, such as nonpromotion or termination, against the plaintiff. *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993). But "there is nothing inherently suspicious" about an employer's decision to promote a minority applicant instead of a white applicant, *id.*, or to fire a white employee. As a result, a majority-group plaintiff alleging Title VII discrimination must show "additional background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* (quoting *Parker v. Balt. & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)) (brackets and internal quotation marks omitted). This "background circumstances" requirement modifies the first prong of the prima facie framework; it "substitutes for the minority plaintiff's burden to show that he is a member of a racial minority." *Id.* It is "not designed to disadvantage the white plaintiff," *id.*, but "means simply that in our society, where 'reverse discrimination' is the exception, white plaintiffs must show more than the mere fact that they are white" before an adverse employment action against them will raise an inference of discrimination, *id.* at 154; *see also Mills v. Healthcare Serv. Corp.*, 171 F.3d 450, 457 (7th Cir. 1999); *Duffy v. Wolle*, 123 F.3d 1026, 1036-37 (8th Cir. 1997); *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1534 (10th Cir. 1995); *Murray v. Thistledown Racing*

*Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985). *But see Iadimarco v. Runyon*, 190 F.3d 151, 160-61 (3d Cir. 1999) (rejecting this requirement); *Lucas v. Dole*, 835 F.2d 532, 534 (4th Cir. 1987) (declining to decide whether to adopt this requirement).

Two general categories of evidence constitute "background circumstances." The first is evidence indicating the particular employer "has some reason or inclination to discriminate invidiously against whites." *Harding*, 9 F.3d at 153. Within this category, we have found sufficient such evidence as political pressure to promote a particular minority because of his race, pressure to promote minorities in general, and proposed affirmative action plans. *See Bishopp v. District of Columbia*, 788 F.2d 781, 787 (D.C. Cir. 1986); *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C. Cir. 1983).[4] The second category is evidence indicating that "there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Harding*, 9 F.3d at 153. Within this category, we have found the following circumstances sufficient: evidence that a plaintiff was given "little or no consideration" for a promotion and that the supervisor never fully reviewed the qualifications of the minority promotee, *Lanphear*, 703 F.2d at 1315; and evidence that a minority applicant was promoted over four objectively better-qualified white applicants "in an unprecedented fashion," *Bishopp*, 788 F.2d at 786. A plaintiff may establish "background circumstances" by

---

[4] In *Parker*, we noted that "a lawful affirmative action program" would not necessarily "in itself constitute suspicious circumstances" justifying an inference of discrimination. 652 F.2d at 1018 n.9. Subsequently, however, in *Bishopp* and *Lanphear*, we acknowledged that where an employer was in the process of drafting or adopting an affirmative action plan, this contributed, in combination with other factors, to the creation of sufficient "background circumstances." *See Bishopp*, 788 F.2d at 787; *Lanphear*, 703 F.2d at 1315.

proffering evidence from either of the two general categories; evidence from both is not necessary. *Harding*, 9 F.3d at 153. Additionally, such circumstances may arise from either the employer's general background or the background of the case at hand. *Id.* In short, the burden for demonstrating "background circumstances" sufficient to sustain a prima facie case of reverse discrimination is minimal, in keeping with our belief that the requirement is not intended to be "an additional hurdle for white plaintiffs," *id.* at 154, and the general understanding that the plaintiff's burden of establishing a prima facie case of discrimination under the *McDonnell Douglas* framework is "not onerous." *Burdine*, 450 U.S. at 253.

The district court determined Mastro failed to establish sufficient "background circumstances" to support a suspicion that Pepco discriminates against white employees. *Mastro*, 398 F. Supp. 2d at 76. The court found Mastro leveled only conclusory allegations of discrimination, for example, testifying he had a "gut feeling" discrimination prompted his termination or merely asserting that his supervisors acted against him in order to benefit two African-American employees, Harsley and Bryant.[5] *Id.* The district court also referred to a 1993 consent decree through which Pepco settled a race and gender discrimination class action. *Id.* The consent decree, which expired in 1998, required Pepco to pay $38 million into a settlement fund and take "certain affirmative steps." Defs.' Suppl. Resp. to Pl.'s Req. for Admis. of Facts 1. These "facts and unsupported allegations," the district court held, established "only a finding that [Mastro] was dismissed in a perfunctory manner for what appears to be an isolated incident of apparent misconduct," not "background circumstances" giving

---

[5] After Mastro's termination, Bryant was one of two individuals who assumed the role of Acting Supervisor of Mastro's team.

rise to an inference of discrimination. *Mastro*, 398 F. Supp. 2d at 76. We disagree.

To begin with, the district court accorded too little weight to the 1993 consent decree. Were Pepco still legally obliged to adhere to its terms, we would doubtless consider it probative evidence of "background circumstances," just as we have previously found proposed affirmative action plans satisfy the standard. *See Bishopp*, 788 F.2d at 786-87; *Lanphear*, 703 F.2d at 1315; *cf. Ineichen v. Ameritech*, 410 F.3d 956, 960 (7th Cir. 2005) (noting that reverse discrimination "is not surprising" when management is "under pressure" from, *inter alia*, "a judicial decree"). Yet it is unreasonable to assume that because the consent decree nominally expired in 1998, Pepco immediately ended the "affirmative steps" it had established pursuant to the decree's terms, or that the decree's lingering effects were not still felt four years later when the events giving rise to this litigation took place. Indeed, the point of many consent decrees is to implement short-term measures that precipitate a paradigm shift having long-term, if not permanent, effects. Thus, we accord some significance to the consent decree and the extent to which a reasonable jury could believe it might encourage Pepco management to treat minority employees in a preferential manner.

Record evidence suggesting reluctance by Pepco management to impose discipline on African-American employees bolsters this view. Mastro offered testimony, unchallenged by Appellees, that one of the African-American employees he supervised, Nelson Daniels, thrice violated company policy or work procedures, costing Pepco thousands of dollars in repairs as a result. In each instance, Mastro recommended to Pancholi that Daniels be disciplined, but Pancholi refused to do so; according to Mastro, Pancholi cited concerns about not

wanting to "stir up the pot" or "create controversy."  Another time when Mastro sought discipline against an African-American employee, he claims he was specifically instructed not to do anything about the situation "because [the employee] is black."  Mastro also testified about a heated confrontation with James Bryant, Mastro's immediate subordinate, during which Bryant approached him in a physically threatening manner and had to be held back by another employee.[6]  Mastro claims that Pancholi refused to discipline Bryant upon Mastro's request, even though Bryant's behavior manifestly violated company policy.  For his part, Pancholi testified that he actually supported Mastro's recommendation to discipline Bryant, dropping the matter only upon Mastro's demand several days later.  Despite this conflict in testimony, however, we believe that by itself and in conjunction with the recently expired consent decree, the evidence Mastro has presented is sufficient for a reasonable jury to discern sufficient "background circumstances" to support a suspicion that Pepco is "the unusual employer who discriminates against the majority." *Harding*, 9 F.3d at 153 (internal quotation marks omitted).  Given Mastro's low evidentiary burden at this point in

---

[6]  Mastro's description is livelier:

> Q: "You said Bryant had to be subdued, who subdued him?"
> A: "Mike Tyson."
> Q: "Mike Tyson?"
> A: "That is correct."
> Q: "How did Mike Tyson subdue him?"
> A: "He held him back.  There was no exchange of blows or anything, it was more or less just being in my face. . . . And Mike kind of held him back and said you could be fired for this, get back, blah, blah, blah, that type of thing."
> Q: "He went back?"
> A: "Well, Mike is much bigger than James Bryant.  He kind of carried him back."

the analysis, he has demonstrated the first prong of his prima facie case.

Mastro also satisfies the remaining elements of his prima facie case. It is undisputed that he was discharged, thereby satisfying the second prong. *See Brown*, 199 F.3d at 456-57. He may satisfy the third and final prong by demonstrating either that he was not performing below his employer's legitimate expectations and was replaced, or that he was treated differently from similarly situated employees who are not part of his protected class. Without addressing the second of these alternatives, we conclude Mastro meets the first of them. Appellees do not dispute that, prior to the Harsley incident, Mastro had been an excellent employee with a clean disciplinary record. They argue, however, that because Pepco believed Mastro lied about his knowledge of Harsley's incarceration, and because lying to one's employer necessarily constitutes performance below legitimate expectations, Mastro therefore performed below Pepco's legitimate expectations. As the district court concluded, this conclusion cannot logically follow. *See Mastro*, 398 F. Supp. 2d at 75 n.6. The conduct alleged by a Title VII plaintiff to be tainted by the employer's discrimination cannot serve as evidence that the employee was performing below the employer's legitimate expectations. Otherwise, any employer could routinely evade Title VII's protections by accusing an employee of misconduct, firing him, and claiming that the employee failed to demonstrate a prima facie case of discriminatory termination because his alleged misconduct constituted performance below legitimate expectations. Appellees' argument to this end is therefore unavailing.

The record also shows that Mastro was replaced after his termination. According to Pancholi, two individuals whom

Mastro had previously supervised, James Bryant and Loman Dudley, served as Acting Supervisors following Mastro's discharge. Appellees suggest that because Mastro's position has not been permanently filled, it cannot be said that he has been "replaced." But whether a terminated Title VII plaintiff's position has been filled on a temporary or permanent basis should not affect the determination of whether the position has been filled for purposes of the prima facie case. The "replacement" requirement serves to weed out claims of discriminatory termination where the plaintiff was discharged simply because his job was being eliminated. So long as a plaintiff shows that another individual replaced him, it is safe to conclude the plaintiff's job was not eliminated. This burden is met even when an employer fills the position temporarily. Indeed, it is not unusual for employers to fill vacant positions on an interim basis until a permanent replacement is found. The very fact that Pepco deemed it necessary to appoint a temporary supervisor after Mastro's termination illustrates the continuing need for someone in that position.[7] We therefore conclude that Mastro has demonstrated a prima facie case of discriminatory termination.

---

[7] Appellees also claim that Mastro has not demonstrated that any of the employees who replaced him possessed qualifications equal to or less than his own, which they contend our decision in *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507 (D.C. Cir. 1995), mandates. *See id.* at 1512. In *Neuren*, however, this element was a dictum, an alternative requirement the court recited but did not employ. None of our subsequent articulations of the prima facie framework has embraced it, and for good reason: as noted, the replacement element is merely a proxy, and requiring the plaintiff to demonstrate that his replacement has equal or lesser skills goes "beyond what is necessary to create an inference of discrimination." *George*, 407 F.3d at 413.

Mastro having satisfied his burden of establishing a prima facie case, the burden shifts to Appellees to articulate a legitimate, nondiscriminatory reason for firing Mastro. *McDonnell Douglas*, 411 U.S. at 802. Appellees' burden is merely one of production, and here, they produce evidence "sufficient for the trier of fact to conclude" Mastro was terminated because of Pepco's belief that he lied. *Reeves*, 530 U.S. at 142. Lying constitutes a dischargeable offense, and thus Appellees have satisfied the second prong of *McDonnell Douglas*.

Appellees having offered a legitimate, nondiscriminatory explanation for terminating Mastro, "the presumption of discrimination 'simply drops out of the picture,'" *Holcomb*, 433 F.3d at 896 (quoting *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)) (internal quotation mark omitted)), and "the sole remaining issue [i]s discrimination *vel non*." *Reeves*, 530 U.S. at 142 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)) (internal quotation marks omitted). "At this point, 'to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.'" *Holcomb*, 433 F.3d at 896 (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

> By 'all of the evidence,' we mean any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evi-

dence of discriminatory statements or attitudes
on the part of the employer.

*Id.*; *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc).

For a number of reasons, we believe Mastro has offered "ample evidence by which a reasonable jury could conclude" that Pepco's stated reasons for terminating him were pretextual and that discrimination motivated its decision. *George*, 407 F.3d at 413. Record evidence suggests that Duarte's investigation, which was central to and culminated in Mastro's termination, was not just flawed but inexplicably unfair. First, Duarte interviewed several individuals, but, curiously, not Mastro himself. Admittedly, Mastro was given an opportunity to offer his version of events, but only at a later date when management had already received the results of Duarte's investigation, putting Mastro on the defensive and depriving him of the same opportunity that was given to Harsley, whom Duarte did interview. For Duarte to have spoken to everyone in the normal course of his investigation except the individual at the center of the controversy—and the only Caucasian—might well strike a jury as odd.[8]

Second, the investigation Duarte did conduct prior to delivering his findings to management lacked the careful,

---

[8] Duarte's failure to conduct an evenhanded inquiry was not only irregular but imprudent. The operative concepts at the center of the dispute—"arrested" versus "incarcerated"—lend themselves to transposition by laymen who only hear them in passing and are asked to recall them after the fact. It may well be that the "contradictions" that led to Mastro's termination were the products not of mendacity but of faulty presuppositions and interpretations, which Duarte could have straightened out by questioning each person involved in the same manner.

systematic assessments of credibility one would expect in an inquiry on which an employee's reputation and livelihood depended. For example, while Duarte and Pepco management appeared to rely heavily on James Bryant's statements in concluding that Mastro had been untruthful, a reasonable jury could find Bryant's credibility questionable. The record reveals that Bryant and Mastro had a strained working relationship and that Bryant, as a second-in-command to Mastro, stood to gain from disciplinary action against his boss. Mastro testified that on "numerous occasions" Bryant displayed "major insubordination" towards him. As noted, on one especially tense occasion, according to Mastro, Bryant accosted Mastro with "fists raised" and "had to be subdued" by another employee. In his account of the incident, Bryant testified that while he shouted and cursed at Mastro, he did not physically confront him. Yet the episode was apparently serious enough that Loman Dudley, a fellow employee and union representative, heard about it despite being absent from work at the time. Bryant also claimed that Mastro had instructed him on the morning of Tuesday, February 19th, to mark Harsley down for vacation because Harsley was in jail; the time sheets from that week, which Bryant kept, show Harsley's approved vacation. Bryant maintained that he was so surprised by Mastro's instruction that he immediately called Dudley, the union representative, to make sure he would not get in trouble for giving Harsley vacation when he was in jail. But Dudley's testimony flatly contradicts this assertion. Dudley contends he was home recovering from surgery and never heard from Bryant until "way after" the incident. A jury might find it curious that neither Duarte nor Pepco management bothered to assess the credibility of the individual whose account proved most central to determining Mastro's fate.

Another puzzling shortcoming of Duarte's investigation is his admitted failure to ask any of the individuals he interviewed whether they were friends with Harsley or if they had talked to each other about the incident prior to speaking with him, even though Duarte himself acknowledged that the members of Mastro's team were "a pretty close-knit group." Yet Duarte not only neglected to determine if collusion or camaraderie may have shaped the stories upon which he based his findings, he testified that such considerations were not an "integral part" of his investigation. Additionally, Duarte's decisionmaking process lacked the appreciable reflection one would expect for resolving such a serious matter. As he described it: "I just interview people, see what they say, and in the back of my mind determine whether I believe what they are saying or not believe what they are saying." In short, in conducting an investigation that rested entirely on the question of credibility, Duarte eschewed consideration of any indicia of credibility. Viewed generously, Duarte seems to have based his determination on the sheer weight of numbers; but sufficient evidence exists for a jury to conclude, alternatively, that discriminatory treatment may have permeated the investigation itself.

Aside from the troubling flaws in Duarte's fact-gathering investigation, Pepco management inexplicably turned a blind eye to the issue of motive. Harsley had every reason to obscure his whereabouts when requesting vacation, for, as Duarte testified, Harsley was on notice that incarceration could have serious consequences for a probationary employee.[9] Pancholi also testified that Harsley would have been fired had he informed Mastro that he was unable to come to work due to

---

[9] Following an earlier incident involving Harsley and an exgirlfriend, Duarte had informed Harsley that incarceration could lead to discipline "up to and including" termination.

incarceration. Mastro, on the contrary, had no motive to be untruthful regarding his knowledge of Harsley's whereabouts. The rules about the handling of such a situation seemed unclear and quite informal. Even after Mastro told Pancholi that Harsley was incarcerated, he was advised to approve the vacation and sort it out later. Pancholi himself admitted that he could not "make any sense" of Mastro's purported lack of candor. Nevertheless, Pancholi steadfastly refused to account for this factor, instead solely relying on the results of Duarte's one-sided investigation.[10]

Appellees believe that the mere fact that they conducted an investigation and fired Mastro as a result should insulate their actions from further scrutiny. But we believe Mastro has presented sufficient evidence to "attack the employer's proffered explanation for its actions." *Holcomb*, 433 F.3d at 897. Mastro's claims call into question whether Appellees' investigation was a reasonably objective assessment of the circumstances or, instead, an inquiry colored by racial discrimination. Unlike our decision in *Fischbach v. District of Columbia Department of Corrections*, 86 F.3d 1180 (D.C. Cir. 1996), where we found there was "nothing the least bit fishy" about the procedure an employer used in subjecting the plaintiff to an adverse employment action, *id.* at 1184, we cannot say the same here. *Cf. Salazar*, 401 F.3d at 509 (denying summary judgment where "a jury could conclude that [an employer] failed to provide a 'fairly administered selection process' and that its claim to the contrary is pretextual"). Whether, for example, Bryant's statements, so critical to the decision to terminate Mastro, are worthy of credibility, and whether the investigation Duarte carried out was fair and impartial are

---

[10] According to Pancholi, he "had no need to jump in and start reasoning this motive versus that motive. Motive would have been one thing, but the outcome of the investigation was another."

genuine issues of material fact properly assigned to the jury. "Although a jury may ultimately decide to credit the version of the events described by [the employer] over that offered by [the employee], this is not a basis upon which a court may rest in granting a motion for summary judgment." *George*, 407 F.3d at 413. Accordingly, we reverse the district court's order of summary judgment with respect to Mastro's discrimination claim.

## B

We turn next to Mastro's defamation claims. Mastro alleges Appellees defamed him when they published the termination memoranda outlining the reasons for his discharge. He argues Appellees acted with malice in publishing the documents because the statements they contained were the products of discrimination. In addition, Mastro claims that Appellees excessively published the memoranda; he maintains that more than twenty Pepco employees were aware of his termination and the circumstances behind it and contends one of the managers privy to the personnel action must have widely communicated the information. Because of the accusations of lying that led to his termination, Mastro asserts, he has been unable to secure another engineering job. The district court concluded Mastro's defamation claims are meritless because he failed to produce any evidence defeating Appellees' privilege to publish the termination memoranda. We agree.

"When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S.

487, 496 (1941). Because federal jurisdiction over Mastro's defamation claims is grounded in supplemental jurisdiction, *see* 28 U.S.C. § 1367, we "look[] to the choice of law rules prevailing in the District of Columbia," which "employs the governmental interest analysis test of the Restatement Second of Conflict of Laws." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001) (citing *Vaughan v. Nationwide Mut. Ins. Co.*, 702 A.2d 198, 200 (D.C. 1997)) (italics omitted). "Applying it to defamation actions, 'the weight of authority considers that the law to be applied is that of the place where the plaintiff suffered injury by reason of his loss of reputation.'" *Id.* (quoting *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984)) (brackets and ellipsis omitted). Mastro is a resident of Maryland; however, if he suffered reputational injury, it was in the District of Columbia, where Pepco employed him and where, as Mastro contends, news of his firing "spread like wildfire" among his colleagues. Accordingly, we examine his defamation claim under District of Columbia law.

To make out a successful defamation action under District of Columbia law, a plaintiff must show

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001) (citations omitted).  Like the district court, we conclude Appellees are entitled to summary judgment because Mastro has not satisfied the second prong of this test.  He has not adduced any evidence raising a genuine issue that Appellees acted outside the scope of applicable privileges—here, the common interest privilege—in publishing the termination memoranda.

The common interest privilege protects otherwise defamatory statements made "(1) . . . in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990).  Two circumstances foreclose asserting the privilege: first, excessive publication, defined as "publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest," *id.*; and, second, publication with malice, which, within the context of the common interest privilege, is "the equivalent of bad faith," *id.* at 1025.  While the defendant bears the burden of proving the elements of the common interest privilege, the burden of defeating the privilege by showing excessive publication or publication with malice lies with the plaintiff.  *See Alade v. Borg-Warner Protective Servs. Corp.*, 28 F. Supp. 2d 655, 657 (D.D.C. 1998); *Moss*, 580 A.2d at 1024; *cf. Smith v. District of Columbia*, 399 A.2d 213, 221 (D.C. 1979).

The record clearly demonstrates that Appellees' publication of the termination memoranda was protected by the common interest privilege and was neither excessive nor imbued with malice.  Uncontradicted evidence shows the memoranda

were only shared with Mastro, certain members of Pepco's management, Pepco's Employee Relations Department, two clerical assistants for filing purposes, and the District of Columbia Department of Employment Services. These individuals and entities possess a legitimate interest in knowing about the nature and outcome of personnel actions at Pepco, and, therefore, their receipt of the memoranda falls within the purview of the common interest privilege. Mastro does not generally dispute this finding; he claims, however, that over two dozen Pepco employees told him, upon his own informal questioning, that they had heard about his termination and the reasons behind it. According to Mastro, "simple deduction" leads to the conclusion the information contained in the termination memoranda was somehow impermissibly communicated to these individuals. But Mastro provides no evidence to support either this assertion or the broader argument that Pepco published the memoranda to anyone beyond those persons authorized to view them under company policy. Despite suggesting that up to twenty-six individuals received the information because of excessive publication, he fails to offer testimony or affidavits from any of them swearing to the source of their knowledge.

In further support of his excessive publication argument, Mastro claims Pancholi published information about his termination to William Sigafoose, a Pepco employee who was neither Mastro's supervisor nor involved in the disciplinary proceedings against him. But uncontradicted evidence indicates otherwise: Sigafoose testified he only heard about Mastro's discharge through word of mouth and without any accompanying explanation of the reasons behind it. Furthermore, Sigafoose, a manager in Mastro's division on the level of Pancholi, was the first individual Mastro claims to have approached when he learned of Harsley's incarceration, since

Pancholi, whom Mastro would have otherwise notified, was occupied in meetings. As a result, even assuming Sigafoose received the termination memoranda, he had a legitimate interest in the information. Thus, Mastro's excessive publication argument does not defeat Appellees' assertion of the common interest privilege.

Mastro's argument that Appellees lost the common interest privilege by publishing the termination memoranda with malice is also unavailing. District of Columbia law sets a high standard for establishing malice sufficient to defeat the protections of the common interest privilege. Malice is defined as "the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will." *Moss*, 580 A.2d at 1025 (quoting *Mosrie v. Trussell*, 467 A.2d 475, 477-78 (D.C. 1983)). But even a showing of ill will does not "forfeit the privilege so long as the *primary* purpose is to further the interest which is entitled to protection." *Columbia First Bank v. Ferguson*, 665 A.2d 650, 656 (D.C. 1995) (quoting *Mosrie*, 467 A.2d at 477-78) (internal quotation marks omitted). That is the case here. The primary purpose behind management's publication of the memoranda was not to sully Mastro's reputation, but to document the events leading to Mastro's dismissal, in conformance with company policy and applicable law. Whatever impermissible motives may have prompted Pepco management to terminate Mastro, Mastro has presented no evidence suggesting that the communication of that decision to a small group of appropriate individuals was driven by anything more than the mundane need for businesses and governments to keep track of personnel actions. Mastro has accordingly failed to satisfy the difficult burden of showing malice. *See Novecon Ltd. v. Bulgarian-American Enter. Fund*, 190 F.3d 556, 567 (D.C.

Cir. 1999) ("[I]f the language of the communication and the circumstances attending its publication . . . are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury . . . ." (quoting *Mosrie*, 467 A.2d at 478 (quoting *Nat'l Disabled Soldiers' League, Inc. v. Haan*, 4 F.2d 436, 441-42 (D.C. Cir. 1925))))).

Mastro has raised no triable issues of fact as to Appellees' loss of the common interest privilege. Because neither excessive publication nor publication with malice exists to defeat the privilege in this case, Mastro has failed to demonstrate a necessary element of defamation. We therefore affirm the order of summary judgment for Appellees with respect to Mastro's defamation claims.

## III

The district court properly granted summary judgment on Mastro's defamation claims, but erred in granting summary judgment on his discrimination claim. Accordingly, the judgment of the district court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*