Filed 12/23/25  Birch v. John Muir Health CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MERLINDA BIRCH,<br><br>        Plaintiff and Appellant,<br>v.<br>JOHN MUIR HEALTH,<br><br>        Defendant and Respondent. | A171661<br><br>(Contra Costa County<br>Super. C2100633) |

Merlinda Birch ("Birch") was a nurse at John Muir Health ("JMH") when JMH terminated her employment based on Birch's purported violations of JMH's polices against harassment and discrimination.  Birch filed an action which included allegations that JMH discriminated against her, failed to reasonably accommodate her disability, and retaliated against her.  The case went to a jury trial, but the trial court declared a mistrial after deciding that certain previously excluded evidence should be admitted but would extend the trial beyond the completion date told to the jurors.  A month later, the court granted JMH's motion for summary judgment or, in the alternative, summary adjudication.  We reverse in part and affirm in part.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2003, Birch, a Filipina woman, began working for JMH as a registered nurse. Two years later, after earning a certificate in wound and ostomy care, she worked full-time on JMH's Skin Wound Assessment Team ("SWAT"). In 2017, Birch transferred to the SWAT team at the Concord Medical Center. At this location, Birch's shifts typically started at 7:00 a.m., and a second SWAT nurse would start an hour later. As the nurse with the earlier shift, Birch would assign that day's SWAT patients between herself and the later arriving SWAT nurse.

From 2017 to 2019, Birch consistently received favorable performance reviews, with managers acknowledging her as a " 'subject matter expert' " who exhibited passion, dedication, teamwork, and strong leadership skills. Others on Birch's SWAT team saw her as a professional and skilled wound and ostomy care nurse.

In June 2019, Rachel Daniels ("Daniels"), a Black woman, began working as a per diem nurse on JMH's SWAT team. Daniels and Birch occasionally worked shifts together at the Concord Medical Center and initially enjoyed an amicable working relationship.

### The Shoe Incident

In March 2020, Birch removed Daniels's shoes from a closet in the SWAT office in an attempt to comply with her interpretation of JMH's heightened infectious disease protocols during the COVID-19 pandemic. This upset Daniels, and the relationship between the two women deteriorated and never recovered. Birch stated that after March 2020, Daniels stopped talking to her. Another SWAT team member also observed Daniels treating Birch coldly. Birch said she apologized to Daniels for the shoe incident, but Daniels

began to shun her and would not respond to her greetings or attempts to exchange pleasantries. Daniels denied this was the case.

Less than two weeks after the shoe incident, Daniels sent an email to Jennifer Parent, Birch's and Daniels's direct supervisor, to complain about Birch's " 'passive aggressive actions, behaviors and comments' " which Daniels believed were directed towards her personally. Daniels indicated she attempted to speak with Birch about this issue but Birch spoke over her and would not allow her to express herself. Daniels requested that Parent help her speak with Birch, and the three women met to discuss ways to improve communication.

### The COVID Patient Assignment Incident

In April 2020, a dispute arose between Birch and Daniels over the issue of COVID patient assignments. At that time, JMH had no set policy regarding the assignment of COVID patients for the SWAT team, but SWAT nurses were of two views: one view was that COVID patients should be divided equally between the nurses, and the other view was that COVID patients should be assigned to one SWAT nurse per shift to limit potential exposure. During this period, there was a day on which Birch assigned Daniels the two COVID patients for the day. This led Daniels to complain to Parent that she was being disproportionately assigned COVID patients and that she did not find it fair " 'to always be assigned to them.' " At Daniels's request, Parent spoke with Birch regarding the equitable distribution of patients and the need for open communication between team members.

### The June 2020 Meetings

Due to ongoing issues with Daniels, Birch requested on several occasions that Parent and Renee Juster ("Juster"), the director of nursing, meet with her and Daniels. In June 2020, Birch and Daniels met with

3

Parent on one occasion, and with Parent and Julie Gage ("Gage"), a JMH Human Resources Business Partner, at another time to discuss Birch and Daniels's ongoing communication issues.

At the June 2020 meetings, Daniels accused Birch of never apologizing for moving Daniels's shoes; calling Daniels at the start of her shift to see if she appeared on time; moving Daniels's personal items at another SWAT office location in 2019; giving Daniels fewer patients than herself; and reviewing Daniels's patient charting when she had no reason to do so.

Birch told Parent and Gage that Daniels's accusations were false. Birch indicated she had apologized to Daniels for the shoe incident; explained she called Daniels at the beginning of shifts just as she did with other SWAT colleagues, not to check on her but to see if she had questions about patient assignments; and offered to show Gage printouts of patient assignments she had made for other nurses to demonstrate she assigned patients to Daniels in the same way. Birch also stated she never reviewed Daniels's patient charts unless asked to do so, and she requested information technology ("IT") conduct a review of access to Daniels's patient charts to evaluate Daniels's claims.

Gage did not look at the patient assignment lists, nor did she or Parent indicate they would review access to Daniels's patient charts.

For her part, Parent described one of the June 2020 meetings in a memorandum that characterized the ongoing conflict as " '[s]everal months of communication difficulty [that] ha[d] resulted in a strained relationship and mutual apprehension regarding ongoing collaboration.' " She also referenced discussions around instances in which either Birch or Daniels had misinterpreted the other's intentions. Parent indicated these issues were

4

affecting Birch's and Daniels's performance and action needed to be taken to improve the situation.

Birch stated that, in the midst of these conflicts, Parent, Juster, and Gage mentioned to her that they had to be very careful in how they addressed Daniels's complaints in light of the protests that had occurred after the death of George Floyd in 2020, a fact that JMH disputes.

After the June 2020 meetings, Birch emailed Parent to let her know that " 'being accused of things that did not occur [was] causing [her] anxiety and stress,' " which was why she gave Parent a " 'print out of [the] past SWAT Run's.' "  Birch also indicated she was not ready to partner with Daniels because she worried about future accusations.  Parent responded she was concerned about Birch's refusal to work with Daniels.  Juster also emailed Birch, stating: " 'I am confident that you will conduct yourself in a professional manner, remain open minded, apply active listening and work together with Rachel D professionally regardless of past difficulties.' "

### *The Patient Complaint Incident*

Another issue arose between Birch and Daniels in August 2020 when Birch informed Daniels that a patient had asked that Daniels be more gentle when performing wound application, and Daniels responded that the patient had also complained of Birch's rudeness.

### *Daniels's Microsoft Teams Post*

In August 2020, Daniels posted a response to a SWAT department Microsoft Teams post about diversity and inclusion, indicating she had " 'experienced both blatant racism in the form of racial slurs from other employees and covert racism in the form of microaggressions,' " sometimes " 'from members of th[e] SWAT team.' "  Daniels's post led Birch to email Juster and Parent that she believed the post was directed towards her.  Birch

5

repeated her fears about partnering with Daniels, expressing worry that " 'no one c[ould] vouch for [her] if something came up.' " Birch met with Daniels, Parent, Juster, and Gage in August 2020 to discuss the post, and she also informed Juster she was " 'not doing well' " and wanted to kill herself because of the situation with Daniels.

At that point, Birch requested and was granted leave for three weeks. Parent and Juster expressed support for Birch, with Parent stating she was glad Birch was prioritizing her mental health and Juster recommending that Birch contact the Employee Assistance Program.

### *Daniels's Dispute with Another SWAT Nurse*

Around this time, a dispute arose between Daniels and another SWAT nurse, Maricon Teodoro. Teodoro had approached Daniels about her August 2020 Microsoft Teams post and asked if she had ever done anything to offend Daniels. Teodoro said Daniels responded by accusing her of stating on multiple occasions: " 'That's why these patients are like this, because they are African-Americans, like they're black.' " Teodoro was shocked when she heard this and repeatedly denied making such a statement, but Daniels continued to insist this happened. Daniels also sent Teodoro an email saying she was "appall[ed]" at how Teodoro responded to her accusations, and at how "[i]nstead of a basic apology and 'I will try to be better' [Teodoro] became aggressive, angry and unwilling to listen." Daniels stated that Teodoro "directed many microaggressions towards [her] over the past year," and that Daniels had notified Teodoro each time this occurred and "ha[d] been very nice about [it]" but Teodoro spoke over her every time. Teodoro claimed this email contained false and inaccurate information.

When Teodoro met with Parent, Gage, and Juster to discuss this issue, she cried and stated Daniels had falsely accused her of making a comment

6

about Black patients.  She also told them that Daniels's email contained false and inaccurate information.  The following week, Teodoro attended a second meeting with Parent, Gage, Juster, and Daniels, which Teodoro described as focused on Daniels's concerns about microaggressions and centered around Daniels teaching Teodoro about this issue.  In Teodoro's view, the meeting felt like four people against one person, and she felt the need to prove she did not have racist views.

### The P&I Study Incident and Verbal Counseling Record

In September 2020, the SWAT team conducted a quarterly Prevalence and Incidents study ("P&I study") which required the participation of multiple SWAT nurses.  Birch asked to not be partnered with Daniels during the study.  A few days later, Birch requested a schedule change so she would not have to work with Daniels on her next scheduled shift.  At that point, Parent reminded Birch of her expectation that Birch work with all members of the team.

A few days later, Juster gave Birch a Record of Documented Verbal Counseling ("verbal counseling record"), which opened with the statement that "[s]everal months of communication difficulty have resulted in strained relationships and apprehension regarding ongoing collaboration within the SWAT team."  The record then referenced one of the June 2020 meetings between Juster, Birch, and Gage, and the specifics steps Birch agreed to take to improve communication with Daniels.  Such steps included providing "[i]mmediate feedback" when Birch felt she was not being heard; reflecting back what she heard when Daniels made a request of her to "confirm [the] message was received as intended"; participating in ongoing meetings with Juster and Parent; and starting her shift at 7:00 a.m. along with Daniels

7

whenever they were scheduled to work together so Birch would "have the opportunity to collaborate" throughout the shift.

The record went on to state: " 'Unfortunately, during your subsequent leave of absence, you missed several opportunities . . . to work with [Daniels].' " The record then mentioned the P&I study where Birch avoided collaboration with Daniels, and a conversation between Birch and Juster the week after where Juster expressed concerns that Birch's communication style had become increasingly "less collaborative" because of Birch's belief that " '[t]he less [she] communicate[d] the less someone w[ould] be mad at [her].' " Finally, the record memorialized that Juster and Birch had discussed the anxiety Birch felt when working with Daniels, and that Birch had been encouraged to use the Employee Assistance program.

The record concluded by citing JMH's value for and expectation of teamwork before stating that "[i]mmediate and sustained improvement" by Birch was expected and that continued issues could lead to the "initiation of progressive corrective action."

### *The October 29, 2020 Patient Assignment Incident*

On October 29, 2020, the nurse who was assigned to work with Birch called in sick, and Parent asked Daniels to cover the shift. But because Birch understood she would be working alone that day, she had already treated five or six of the 14 patients by the time Daniels arrived four hours into Birch's shift. When Birch gave Daniels her assignment, Daniels called Birch and asked why she was given only five out of the 14 patient assignments. Juster, who overheard this conversation, said that Daniels communicated in a professional and appropriate manner but Birch (whose voice Juster could hear on the phone) sounded " 'angry.' "

8

As a result of this incident, Birch requested a meeting as she had been instructed to do by Parent, Juster, and Gage when there was an issue involving Daniels. That same day, after Birch and Daniels met with Juster to discuss this incident, Juster sent an email to both nurses stating the expectation that they " 'both continue to work together' " consistent with " 'the JMH brand promise to listen, explain and work as a team.' " Juster later indicated to Parent that the two nurses " 'disagreed on everything' ", to which Parent responded: " 'Ugh. They both need to stop.' "

### Daniels's Allegations of Racial Discrimination by Birch

The following day, on October 30, Daniels sent Juster, Parent, and Gage an email complaining that Birch had racially harassed and discriminated against her. In this email, Daniels leveled 21 accusations, including allegations of Birch's policing of Daniels's presence in the office and use of communal items; repeatedly calling Daniels to see if she had showed up to work; reviewing Daniels's charting despite not being asked to do so; questioning Daniels's judgment; refusing to place her items near Daniels's items; intentionally excluding Daniels from decisions for the office space; making inequitable patient assignments; and making "[v]eiled threats in response to [Daniels's] regular everyday actions." Daniels also claimed Birch had an "explosive and inappropriate reaction" to Daniels's sharing of her experiences of racism in the workplace, and she asserted Birch indicated during a meeting that she "[did not] see Black Americans as any [*sic*] more than 'housekeepers and CNAs.' "

Daniels also specifically brought up the October 29 patient assignment issue, complaining that Birch was not giving Daniels an "equal assignment as she would give to all other people who work in this department." She also accused Birch of responding poorly and talking over her when she brought

9

this issue to Birch's attention. Daniels claimed Birch had been given many opportunities to "just accept and acknowledge her bias" but failed to do so. Daniels also stated she "c[ould] not understand why this continue[d] to happen" apart from the fact "[she was] the only Black-American employee in th[e] department." Lastly, Daniels expressed concerns regarding the "care [Birch] provides to Black patients" "[i]f she is unable to see her Black co-worker as an equal."

Juster responded that same day acknowledging Daniels's concerns and stating the "ongoing situation remains extremely disturbing." She also assured Daniels that JMH took her concerns and the responsibility to "serv[e] all patients equally and equitably without bias" very seriously. That same day, Gage emailed Juster to ask if she preferred to terminate Birch or to give a written warning and mandatory training with the next incident to result in termination. Juster immediately responded that her preference was to move to termination. On November 5, well before the investigation into Daniels's allegations was completed, Juster sent Daniels an email stating that Daniels was a " 'blessed addition' " to the SWAT team and expressing " 'how important' " it was for Daniels to " 'feel heard and supported.' "

Around this time, Birch requested and was granted another leave of absence from November 2 to November 22.

### JMH's Investigation

After Juster indicated her preference to move toward termination, Gage conducted an investigation into Daniels's complaint of racial discrimination by Birch. During this investigation, Gage conducted interviews with Daniels, Juster, and Birch. These interviews focused exclusively on the October 29 patient assignment incident when Daniels came four hours into Birch's shift and was assigned five out of the 14 patients

10

for the day.  During these interviews, both Daniels and Juster stated that when Birch was asked how many patients she would have given "David" (the nurse who had called in sick) if he had come into work (presumably on time at the start of his shift), Birch said she would have given him seven patients. When Birch was interviewed though, she noted that by the time Daniels came in around 11:00 a.m., Birch had already seen five of the 14 patients and, thus, Daniels was given five of the remaining nine patients.

After her investigation, Gage wrote a report in which she concluded that it was "more likely than not" that Birch violated JMH's policy prohibiting harassment or discrimination in the workplace.  In support, Gage stated in her report that the interviews regarding the October 29 incident demonstrated that Birch was "inequitable [in] assigning less patients to [Daniels]," and that Birch "admitt[ed] that she would have divided the patient assignments equally if she had worked With [sic] David" whom the report notes was a "White male."

Gage's investigative report also referenced a number of "incidents" that "provided sufficient evidence" to suggest that Birch's actions towards Daniels were "pervasive and based on protected characteristics."  These "incidents" consisted of the following seven allegations taken from Daniels's October 30 email, wherein Daniels accused Birch of:  (1) repeated calls to " 'see if [Daniels] showed up' " for her shift; (2) reviews of Daniels's patient charts; (3) refusals by Birch to put her personal items next to Daniels's items; (4) moving Daniels's personal items without permission on multiple occasions; (5) stating on a few occasions that Daniels was only hired to " 'help' " in the office when "help" was a word that Daniels found offensive; (6) telling Daniels that her hair was " 'so much better' " and " 'appropriate' "

11

when it was styled in a more straight style[1]; and (7) accusing Daniels of wearing " 'dirty' " lab coats to see patients. There was no indication in the report that Gage interviewed any members of the SWAT team other than Birch or Daniels or engaged in any independent fact finding to determine the veracity of these allegations.

### Birch's Termination

Following Gage's investigation, JMH terminated Birch's employment. In a meeting held in January 2021, Juster, Parent, and Gage provided Birch with a letter stating that despite coaching and verbal counseling, Birch's conduct " 'continue[d] to manifest in unacceptable behaviors' " that did not comply with JMH's non-discrimination and harassment policy, its " 'HR-Standards of Conduct' " policy, and its " 'HR-Standards of Professional Relations' " policy.

Among other things, JMH's HR – Standards of Conduct policy lists examples of unacceptable employee conduct, including " 'behavior and communication not in keeping with the JMH's Core Values, which include honesty, integrity, teamwork, and mutual respect.' " Similarly, JMH's HR – Standards of Professional Relations policy requires employees to " 'conduct themselves in a professional manner,' " " 'maintain professional behavior at all times,' " " 'remain open-minded and actively listen to others' points of view,' " " 'verbalize disagreements respectfully and privately in a well-modulated voice,' " " 'honor cultural and individual differences,' " " 'communicate with each other in a respectful manner,' " and " 'work

---

[1]	Birch stated that someone else made this comment and that Daniels had wrongly attributed it to her.

12

together professionally regardless of past difficulties.' "  Both Birch and Daniels were subject to these policies.

**The Instant Action**

Birch's first amended complaint (the "complaint") alleges causes of action for: (1) race and national origin discrimination, (2) race and national origin harassment, (3) failure to prevent race and national origin harassment and discrimination, (4) failure to provide a reasonable accommodation, (5) failure to engage in the interactive process, (6) retaliation in violation of the Government Code, (7) age discrimination, (8) retaliation in violation of the California Family Rights Act, (9) wrongful termination in violation of public policy, (10) defamation per se, and (11) defamation per quod.

The case went to jury trial, but the trial court declared a mistrial after it decided that some previously excluded evidence should be admissible, which would result in the trial not being completed by the date told to the jurors.  A month later, JMH filed a motion for summary judgment or, in the alternative, summary adjudication (the "summary judgment motion").  The trial court granted the motion and dismissed the case.

This appeal followed.

## DISCUSSION

A trial court properly grants a motion for summary judgment when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  A moving defendant bears the burden of showing that the plaintiff " ' "has not

13

established, and cannot reasonably expect to establish, a prima facie case." ' " (*Bailey v. San Francisco Dist. Attorney's Off.* (2024) 16 Cal.5th 611, 620 (*Bailey*).) Once that burden has been met, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists. (Code Civ. Proc., § 437c, subd. (p)(2).)

"On appeal, we examine the record de novo, viewing the evidence in the light most favorable to the plaintiff as the losing party and resolving any evidentiary doubts or ambiguities in her favor." (*Bailey*, *supra*, 16 Cal.5th at p. 620; see also *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286 (*Hartford*).) "[S]ummary judgment should not be granted unless the evidence cannot support any reasonable inference for plaintiff." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 283 (*Nazir*).)

Birch argues the trial court erred in granting JMH's summary judgment motion because there were triable issues of material fact as to her claims for race and national origin discrimination, failure to provide a reasonable accommodation, failure to engage in the interactive process, retaliation for taking medical leave, and defamation.[2]

## A.     Race and National Origin Discrimination

"FEHA prohibits an employer from subjecting an employee to an adverse employment action based on the employee's protected status. (Gov. Code, § 12940, subd. (a).) In evaluating claims of discrimination under FEHA, California courts apply the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 93 S.Ct. 1817, 36

---

[2]     Birch additionally requests, in the event of retrial, that we deem admissible evidence regarding two JMH doctors who also complained about Daniels's teamwork, communication, coordination, and professionalism. We decline to address this request as there is no indication that issue was before the trial court on JMH's summary judgment motion.

14

L.Ed.2d 668 [*McDonnell Douglas*].” (*Martin v. Bd. of Trs. of California State Univ.* (2023) 97 Cal.App.5th 149, 161 (*Martin*).) “Under this approach, if the plaintiff establishes a prima facie case supporting his or her discrimination claim, the burden of production shifts to the employer to rebut the presumption of discrimination by offering a legitimate, nondiscriminatory reason for the adverse employment action.” (*Ibid.*) “If the employer puts forth a legitimate basis for the adverse employment action, the burden of production shifts to the plaintiff to present evidence creating a triable issue of fact showing the employer’s stated reason was a pretext for unlawful animus in order to avoid summary judgment.” (*Id.* at p. 162.)

To establish a prima facie case of discrimination under FEHA, a plaintiff must provide evidence demonstrating he or she (1) was a member of a protected class, (2) was qualified for the position sought or performing competently in the position held, (3) suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) was subject to some other circumstance suggesting a discriminatory motive. (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).)

On summary judgment, an employer may meet its initial burden by presenting evidence that one or more of these elements is lacking, or the employer acted for a legitimate, nondiscriminatory reason. (*Martin, supra,* 97 Cal.App.5th at p. 162.) “If the employer puts forth a legitimate basis for the adverse employment action, the burden of production shifts to the plaintiff to present evidence creating a triable issue of fact showing the employer’s stated reason was a pretext for unlawful animus in order to avoid summary judgment.” (*Ibid.*) An employer is entitled to summary judgment only “if, considering the employer’s innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the

15

employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th at p. 361.)

Birch initially pled in her complaint that JMH discharged her because she was Filipina. At the time of summary judgment though, Birch's theory of discrimination was predicated not on JMH's discrimination against her because she was Filipina, but on JMH's more favorable treatment of Daniels because she was Black.

JMH moved for summary judgment on this claim, arguing that Birch could not establish the second and fourth elements of the cause of action, namely, that she was performing competently in her position and that JMH had a discriminatory motive.[3] JMH also asserted that it terminated Birch for legitimate, non-discriminatory reasons, and that Birch would not be able to demonstrate this reason was pretextual.

The trial court agreed Birch could not establish that JMH had a discriminatory motive for terminating her employment.[4] It also found substantial evidence supporting the conclusion that JMH terminated Birch for a legitimate, nondiscriminatory reason.

Birch contends this was error because there were triable issues of material fact as to whether she was performing competently at her job, whether JMH had a discriminatory motive, and whether JMH terminated Birch for a legitimate, nondiscriminatory reason. We address each of these contentions in turn.

---

[3] JMH did not dispute that Birch was a member of a protected class and had suffered an adverse employment action.

[4] The trial court's ruling did not address the issue of whether Birch could establish that she was competently performing in her position.

16

### Birch's Job Performance

The trial court did not address the issue of whether Birch would be able to establish she was performing competently at her job. Regardless, we are not persuaded by JMH's contention that Birch would not be able to make this showing.

"A plaintiff's burden in making a prima facie case of discrimination is not intended to be 'onerous,' " and while it is true a plaintiff must demonstrate "some basic level of competence at his or her job . . . any measurement of such competency should, to the extent possible, be based on objective, rather than subjective, criteria." (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 322 (*Sandell*).) Such objective criteria include performance reviews or evidence the plaintiff possessed the necessary qualifications for his or her job at the time of termination. (See *ibid.*)

Here, Birch presented substantial evidence that in the years preceding her termination, she consistently received favorable performance reviews in which her superiors acknowledged her skills, professionalism, and leadership abilities. Indeed, just three months before JMH terminated Birch, Parent wrote to commend her: "What a team player! . . . helping others is your super power!" There was also no dispute that Birch was qualified to do her job as a wound and ostomy nurse. Thus, viewing the evidence in the light most favorable to Birch, a fact finder could reasonably conclude she was qualified to do her job and was generally performing competently in her position. (See *Sandell, supra*, 188 Cal.App.4th at p. 322.)

In contending that Birch was not meeting its legitimate expectations, JMH refers to multiple instances in which Birch and Daniels's superiors stepped in to help mediate their conflicts. JMH frames these incidents as repeated examples of JMH counseling Birch for not meeting its expectations.

This overlooks the evidence that a number of the meetings were initiated by Birch as she sought help navigating her work relationship with Daniels, and not by JMH because Birch was not meeting JMH's expectations. JMH also ignores the evidence that up until shortly before Daniels accused Birch of discrimination, Birch and Daniels's superiors largely viewed the nurses as mutually contributing to their problematic relationship. Specifically, Parent commented in June 2020 that both nurses had experienced " 'communication difficulty' " and misinterpretation of each other's intentions which was affecting their work performance, and stated in October 2020, " 'Ugh. They both need to stop.' "

Last and most significantly, each of the incidents cited by JMH related to its handling of the dispute between Birch and Daniels, which Birch alleges was tainted by JMH's discriminatory preference for Daniels because she was Black. Because JMH's handling of the matter forms the very basis of Birch's discrimination claim, such incidents provide questionable support for JMH's claims that Birch was performing below its legitimate expectations. (See *Mastro v. Potomac Elec. Power Co.* (D.C. Cir. 2006) 447 F.3d 843, 853–854 (*Mastro*).[5]) Indeed, concluding otherwise would allow employers to "routinely evade [liability] by accusing an employee of misconduct, firing him, and claiming that the employee failed to demonstrate a prima facie case of discriminatory termination because his alleged misconduct constituted performance below legitimate expectations." (*Ibid.*)

---

[5] *Mastro* was a case brought under Title VII of the Civil Rights Act of 1964. Though the opinion is not binding authority in California, we may look to federal decisions interpreting Title VII for assistance in interpreting FEHA. (See *Reno v. Baird* (1998) 18 Cal.4th 640, 647.)

18

***Discriminatory Motive***

Birch asserts there was a triable issue of fact as to whether JMH's termination of her employment was based on JMH treating Daniels more favorably because Daniels was Black. More particularly, Birch contends that even though she and Daniels were similarly situated, experienced mutual difficulties working together, and were both arguably in violation of JMH's core values and HR policies, Birch was the only one who was disciplined and terminated. Viewing the evidence in the light most favorable to Birch as the party opposing summary judgment, we agree there is sufficient evidence to raise a triable issue of fact as to JMH's alleged discriminatory treatment.

"Plaintiffs in FEHA cases can prove their cases by presenting either direct evidence, such as statements or admissions, or circumstantial evidence, such as comparative or statistical evidence." (*Gupta v. Trustees of California State Univ.* (2019) 40 Cal.App.5th 510, 519 (*Gupta*).) "Comparative evidence is 'evidence that [the plaintiff] was treated differently from others who were similarly situated' but are outside the plaintiff's protected class." (*Ibid.*) "In general, 'individuals are similarly situated when they have similar jobs and display similar conduct.'" (*Id.* at p. 520.)

Importantly, evidence that an employer showed favorable treatment to a similarly situated employee is probative of the employer's discriminatory or retaliatory intent. (*Wawrzenski v. United Airlines, Inc.* (2024) 106 Cal.App.5th 663, 688 (*Wawrzenski*).) An inference of discrimination may also be established by disparate discipline where " 'the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but . . . the employer did not discipline the other employee similarly.' " (*McGrory v. Applied Signal Tech., Inc.* (2013) 212 Cal.App.4th 1510, 1535; see *Mastro, supra,* 447 F.3d at p. 853 [finding a

19

prima facie case of discrimination based in part on "[r]ecord evidence suggesting reluctance by [company] management to impose discipline on African-American employees"].)

Based on the evidence presented, a reasonable factfinder could find that Birch and Daniels had similar jobs and displayed similar conduct but were treated differently.

With respect to their jobs, Birch submitted evidence that she and Daniels were both wound and ostomy care nurses who worked on the SWAT team, and that she and Daniels both engaged in conduct that arguably violated aspects of JMH's core values and HR policies that required teamwork, professionalism, respectful communication, and the willingness to work together professionally regardless of past difficulties. For example, there was evidence that both nurses experienced persistent difficulties working and communicating with each other, which led both to seek supervisorial assistance on numerous occasions after various conflicts and misunderstandings. There was also evidence the superiors believed *both* women were contributing to their interpersonal issues, with Parent stating in a June 2020 report that " '[s]everal months of communication difficulty have resulted in a strained relationship and *mutual apprehension* regarding ongoing collaboration' " and that discussions occurred about " 'specific examples where *the intentions of one or both of* [*the nurses*] *has been misinterpreted by the other*.' " (Italics added.) And as previously recounted, after the October 29, 2020 patient assignment dispute, Juster noted both nurses disagreed about everything, with Parent stating, " 'Ugh. They *both* need to stop.' " (Italics added.) Juster later emailed both nurses: " 'It is the expectation that *you both* continue to work together living [*sic*] the JMH brand promise to listen, explain and work as a team.' " (Italics added.)

20

Beyond showing JMH's awareness of the nurses' mutual difficulties in working together, Birch presented evidence that Daniels engaged in other conduct that arguably violated JMH's core values of honesty and integrity. More particularly, in June 2020, Birch complained to her superiors that in their group meetings, Daniels had leveled a number of false accusations against Birch, ranging from the claim that Birch never apologized for the shoe incident to claims that Birch's patient assignments to Daniels differed from Birch's patient assignments to other SWAT nurses (which Birch asserted could be disproved if JMH reviewed the patient assignment lists Birch made for other SWAT nurses). Further, Birch was not the only employee to have complained of Daniels's false accusations of racism. Specifically, there was evidence that another nurse, Teodoro, had informed Parent, Gage, and Juster that Daniels had falsely accused her of stating " 'That's why these patients are like this, because they are African-Americans, like they're black,' " when Teodoro insisted she had never made this statement. Like Birch, Teodoro also complained that Daniels sent an email with accusations containing false and inaccurate information. That incident, however, appeared to result only in a meeting focused on Daniels educating that nurse (Teodoro) about microaggressions.

Notwithstanding all this evidence and the evidence that Birch and Daniels accused the other of conduct that arguably violated JMH's core values and HR policies, JMH did not treat or respond to the two nurses in the same way. Notably, there appears no evidence that Daniels received any type of discipline even though Parent and Juster indicated they viewed her as half of the problem. And as Birch points out, an inference of JMH's preferential treatment of Daniels may be gleaned from the evidence that Parent, Juster, and Gage told Birch they had to be very careful in how they

21

addressed Daniels's allegations and complaints in light of the protests that had occurred after the death of George Floyd in 2020. This inference seems bolstered by record evidence that, after Daniels accused Birch of discrimination but before Gage had even completed her investigation into these allegations, Juster not only expressed to Gage her preference to terminate Birch, but also emailed Daniels to tell her she was a " 'blessed addition' " to the SWAT team.

In contrast, without investigating the factual underpinnings of Daniels's accusations against Birch or Birch's responses to those accusations, JMH issued Birch a verbal counseling record when Birch continued to struggle with anxiety over working with Daniels. JMH also moved swiftly to terminate Birch after the nurses' second conflict over patient assignments on October 29, 2020 and Daniels's subsequent accusations of racial harassment and discrimination, based solely on its review of the October 29 incident and seven under-investigated allegations from Daniels's October 30 email.

Viewing all of this evidence together in the light most favorable to Birch (see *Hartford*, *supra*, 59 Cal.4th at p. 286), we conclude a reasonable factfinder could find that Birch and Daniels were similarly situated and yet were treated differently (see *Wawrzenski*, *supra*, 106 Cal.App.5th at p. 690).

In concluding to the contrary, the trial court indicated that Birch's case amounted to nothing more than that Daniels was Black and that JMH believed Daniels's versions of events over Birch's. We cannot agree with this oversimplistic view of the record. As recounted above, the evidence of JMH's treatment of Birch and Daniels did not center merely around JMH believing Daniels over Birch. Not only was there evidence that both nurses engaged in conduct that arguably violated JMH's core values and HR policies, but JMH superiors are on record as viewing the problematic workplace issues as

22

stemming from both individuals. Yet JMH did not deal with Birch's and Daniels's complaints against each other in the same manner.

The trial court additionally ruled that Birch and Daniels were not similarly situated because Birch was accused of racial discrimination while Daniels was not.[6] This analysis misses the mark. We acknowledge that Daniels *accused* Birch of racial discrimination, while Birch made no such accusation against Daniels. But the relevant issue in determining the similarity of Birch's and Daniels's situations is whether they generally displayed similar conduct that should have warranted similar responses by JMH, not whether the two leveled the same specific accusations against each other. (See *Gupta*, *supra*, 40 Cal.App.5th at p. 519.)

*Wawrzenski* is instructive in this regard. In *Wawrzenski*, defendant United Airlines, Inc. ("United") investigated and ultimately fired a female employee for violating its social media policy when she had a social media account that featured pictures of herself in uniform and wearing a bikini, with a link to an OnlyFans account that advertised " '[e]xclusive private content you won't see anywh[ere else].' " (*Wawrzenski*, *supra*, 106 Cal.App.5th at pp. 671, 677.) In a lawsuit alleging gender discrimination, the employee presented evidence that three male United employees were not disciplined or received only a performance warning for having similar social media accounts featuring pictures of themselves in uniform and in

---

[6] The trial court addressed the issue of whether Birch and Daniels were similarly situated not in its analysis of whether JMH had a discriminatory motive, but in its analysis of whether JMH had a legitimate, nondiscriminatory reason for terminating Birch. We observe, however, that a showing of disparate treatment or policy enforcement is probative of *both* discriminatory intent and pretext. (See *Wawrzenski*, *supra*, 106 Cal.App.5th at pp. 688, 691.)

23

" 'suggestive' " poses.  (*Id.* at pp. 672, 687–688.)  The trial court ruled these comparators were not similarly situated because the female employee did not show that anyone had filed a complaint about the male employees or that the male employees had OnlyFans accounts that they were advertising in United uniforms.  (*Id.* at p. 689.)

In reversing, the Court of Appeal concluded the trial court had "used the wrong standard for comparator evidence" when it "required [the comparators'] conduct and treatment to be identical to Wawrzenski's in all respects" instead of "similar 'in all relevant respects.' "  (*Wawrzenski, supra,* 106 Cal.App.5th at p. 689.)  Determining that a reasonable factfinder could conclude the plaintiff and the three male United employees were " ' " 'sufficiently similarly situated to support an inference of discrimination,' " ' " the court held the trial court had "usurped the role of the factfinder" in rejecting the female employee's comparator evidence.  (*Id.* at pp. 672, 690.)

As in *Wawrzenski*, a reasonable factfinder could find here that Birch and Daniels were similarly situated in their longstanding feud against one another and in their mutually antagonistic conduct that appeared to violate JMH values and policies.  (See *Wawrzenski, supra,* 106 Cal.App.5th at p. 690.)  Accordingly, the trial court applied an overly narrow application of the standard for comparator evidence when it seemingly required Birch's and Daniels's conduct to be identical in the specific nature of the accusations they made against each other and in the particular JMH policies they allegedly violated.

### *Legitimate, Nondiscriminatory Reason*

Under the *McDonnell Douglas* framework, even if an employee establishes a prima facie case for discrimination, an employer may rebut the

24

presumption of discrimination by offering a legitimate, nondiscriminatory reason for the adverse employment action, and the burden then shifts back to the employee to present a triable issue of fact as to whether the employer's stated reason was pretext. (*Martin*, *supra*, 97 Cal.App.5th at p. 162.)

In ruling that JMH had a legitimate, nondiscriminatory reason for terminating Birch, the trial court found "more than ample evidence" that Birch was "fostering racial disharmony among the SWAT team" and no evidence that JMH's decision to terminate was "racially rigged." The court, however, did not indicate what "ample evidence" it relied on. We are not convinced.

Up until Daniels accused Birch of discrimination on October 30, 2020, there was no indication that JMH viewed Birch's conduct towards Daniels as being fueled by racial animus. Instead, the JMH superiors repeatedly framed the issues between the two nurses as stemming from communication difficulty, mutual apprehension, and misinterpretation of the other's intentions. After Daniels accused Birch of discrimination, JMH's reactions and investigation into Daniels's allegations appeared to lack neutrality. As previously indicated, there was evidence showing that, before the investigation was completed, Juster told Daniels she was a " 'blessed addition' " to the SWAT team and also informed the investigator of her preference to terminate Birch.

Based on the foregoing, we are not persuaded in the first instance that JMH established a legitimate, nondiscriminatory reason for Birch's termination that was sufficient to shift the burden to Birch to demonstrate a triable issue of fact that this stated reason was pretext. (See *Martin*, *supra*, 97 Cal.App.5th at p. 162.)

25

Nonetheless, even assuming JMH had carried its burden, Birch's evidence precluded a grant of summary judgment.  As Birch correctly points out, pretext can be established by demonstrating that an employer treated similarly situated employees differently or that it engaged in an inadequate investigation.  (See *Wawrzenski*, *supra*, 106 Cal.App.5th at p. 690 [disparate policy enforcement or failure to adequately investigate can constitute evidence of pretext]; e.g., *Mendoza v. Western Medical Center Santa Ana* (2014) 222 Cal.App.4th 1334, 1344 (*Mendoza*) [lack of rigorous investigation is evidence suggesting defendants did not value the discovery of truth as much as a way to "clean up the mess" that was uncovered when a complaint was made]; *Nazir*, *supra*, 178 Cal.App.4th at p. 280 ["employer's failure to interview witnesses for potentially exculpatory information evidences pretext"]; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 121 (*Reeves*) ["lack of thoroughness" in investigation supported an inference of discriminatory pretext].)

Here, Birch presented substantial evidence that JMH terminated her after conducting a minimal, one-sided investigation into Daniels's complaints of racial discrimination.  As the record reflects, Gage's investigative report includes reference to the nurses' dispute over patient assignments.  But Daniels had previously raised the issue of Birch's alleged inequitable assignments during the June 2020 meetings, at which time Birch indicated that printouts of the patient assignment lists would disprove Daniels's claim of inequitable assignments.  There is no indication that Gage looked at any patient assignment list, either in June 2020 or during the pre-termination investigation.  Moreover, there was evidence that Birch provided a reasonable explanation for Daniels's complaint about Birch's October 29

26

assignment decision,[7] yet Gage concluded that Birch discriminatorily assigned less patients to Daniels that day based simply on Birch's statement that she would have assigned seven patients to the originally scheduled nurse who, Gage noted, was a "White male," if he had come in for his shift.

Gage's report illuminates other arguable deficiencies in the investigation. Chief among these was the fact that Gage additionally predicated her finding of discrimination by Birch on seven "incidents" listed in Daniels's October 30, 2020 email, including Daniels's allegations that Birch would call her at the beginning of shifts, review her patient charts, and that Birch told her that her hair was " 'so much better' " and " 'appropriate' " when it was styled in a more straight fashion. Though Gage cited these items in her report, there is no indication she sought to substantiate these allegations. A reasonable jury could conclude that this investigative omission, in the context of the serious and ongoing "she said/she said" employee allegations at issue, is significant. For instance, the record indicates Birch denied making the hair comment and stated Daniels had wrongly attributed this statement to her. Moreover, Birch had previously indicated it was her practice to call SWAT team members at the beginning of their shifts to see if they had questions about patient assignments, and that she did not limit this practice to Daniels. Gage, however, did not speak to SWAT team members on these points and made no effort to independently verify Daniels's claims.

---

[7] Birch indicated in an interview with Gage that she had already finished five of the 14 patients for the day by the time Daniels arrived around 11:00 a.m. (presumably halfway through Birch's shift) to fill in for the nurse who had called in sick. As such, there were only nine remaining patients by the time Daniels began working, and Birch assigned her five.

27

Based on the foregoing evidence, which we construe in the light most favorable to Birch (see *Hartford, supra*, 59 Cal.4th at p. 286), we conclude there are triable issues of fact as to whether the reason given for Birch's termination was pretextual. (See *ibid.*, *Nazir, supra*, 178 Cal.App.4th at p. 280, *Mendoza, supra*, 222 Cal.App.4th at p. 1344, *Reeves, supra*, 121 Cal.App.4th at p. 121.)

## B. Failure to Provide a Reasonable Accommodation

Under FEHA, "employers are required to make reasonable accommodation for the known disability of an employee unless it would produce 'undue hardship' to its operation." (*Kaur v. Foster Poultry Farms LLC* (2022) 83 Cal.App.5th 320, 345 (*Kaur*); Gov. Code, § 12940, subd. (m)(1).) A reasonable accommodation is "a modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held or desired." (*Nadaf-Rahrov v. Neiman Marcus Grp., Inc.* (2008) 166 Cal.App.4th 952, 974 (*Nadaf-Rahrov*).) "The elements of a failure to accommodate claim are '(1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability.' " (*Swanson v. Morongo Unified Sch. Dist.* (2014) 232 Cal.App.4th 954, 969.)

In the proceedings below, the trial court noted that Birch had only requested two forms of accommodations for the anxiety she felt from working with Daniels: (1) medical leave and (2) reassignment so she would not have to work with Daniels. The court then concluded that JMH did not fail to reasonably accommodate Birch because her request for medical leave was granted and because her request for reassignment was unreasonable as a matter of law. To support its latter conclusion, the court cited an Equal

28

Employment Opportunity Commission ("EEOC") enforcement guideline, *Jackson v. Kaplan Higher Educ., LLC* (E.D. Cal. 2015) 106 F.Supp.3d 1118, 1128 (*Jackson*), and *Gaul v. Lucent Techs., Inc.* (3rd Cir. 1998) 134 F.3d 576, 581 (*Gaul*).[8]

Birch does not challenge the trial court's medical leave ruling but contends it erred in concluding a request for reassignment away from a coworker is unreasonable as a matter of law. We agree.

At the outset, we observe the trial court relied on nonbinding and inapposite federal authorities to support its conclusion. (*Donley v. Davi* (2009) 180 Cal.App.4th 447, 461.) That is, the EEOC guideline and the *Jackson* decision are off the mark as they involve requests for reassignments away from a supervisor, not a coworker. And for the reasons below, the *Gaul* decision, which did involve a requested reassignment away from a coworker, does not support the trial court's categorical ruling.

In *Gaul*, a plaintiff with depression and anxiety-related disorders began experiencing inordinate stress due to his assignment with a particularly challenging coworker. (*Gaul, supra*, 134 F.3d at pp. 577, 578.) When his request for a transfer away from this coworker was denied, he filed a lawsuit under the Americans with Disabilities Act ("ADA"), alleging a claim for failure to accommodate. (*Id.* at pp. 578–579.) The Third Circuit Court of Appeals concluded that a request for a transfer away from the individuals

---

[8] The trial court also anomalously cited *Higgins-Williams v. Sutter Med. Found.* (2015) 237 Cal.App.4th 78, which held that "anxiety and stress related to [a] supervisor's standard oversight of [an] employee's job performance does not constitute a disability under FEHA," despite acknowledging the fact that *Higgins* did not reach the issue of whether a request for reassignment would be unreasonable.

causing a plaintiff stress is "unreasonable as a matter of law under the ADA" because it would impose a "wholly impractical obligation" and "extraordinary administrative burdens" to require an employer to always consider an employee's stress level when assigning projects or teams. (*Gaul*, *supra*, 134 F.3d at pp. 579, 581.) Believing that a contrary holding would require courts to "establish the conditions of [a plaintiff's] employment, most notably, with whom he will work," *Gaul* concluded that " 'nothing in the ADA allow[ed] this shift in responsibility.' " (*Ibid.*)

We acknowledge that *Gaul*'s views regarding the unreasonableness of an extraordinarily burdensome accommodation generally aligns with FEHA's contemplation that employers are not required to make an accommodation that would pose an " 'undue hardship' " to the employer's operation. (See *Kaur*, *supra*, 83 Cal.App.5th at p. 345.) But we believe *Gaul* painted with too broad a brush when it concluded—as a matter of law—that a request for reassignment would *always* be extraordinarily burdensome for an employer.

Indeed, it is well-established that whether an accommodation is reasonable is almost always a question of fact.[9] (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 374 (*Nealy*); see also *Prilliman v. United*

___

[9]    In fact, we are aware of no California authorities that have established the unreasonableness of a specific accommodation as a matter of law, except where the accommodation would result in the elimination of an essential function of a position or require the creation of a new position. (See, e.g., *Nealy*, *supra*, 234 Cal.App.4th at p. 375 [elimination of an essential function is not a reasonable accommodation because this would be "at odds" with the definition of the employee's prima facie case for failure to accommodate]; *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1226 ["FEHA does not require the employer to create a new position to accommodate an employee, at least when the employer does not regularly offer such assistance to disabled employees."].)

*Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 954 [reasonableness of an accommodation is generally a question for the jury]; accord, *Nunes v. Wal-Mart Stores, Inc.* (9th Cir. 1999) 164 F.3d 1243, 1247 [whether an accommodation poses an undue hardship to an employer is by nature a highly "fact-specific, individualized inquiry"].)  The factual nature of the inquiry is recognized in FEHA itself, which defines an "undue hardship" as "an action requiring significant difficulty or expense, when considered in light of the following factors:  (1) The nature and cost of the accommodation needed.  (2) The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility.  (3) The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.  (4) The type of operations, including the composition, structure, and functions of the workforce of the entity.  (5) The geographic separateness or administrative or fiscal relationship of the facility or facilities."  (Gov. Code, § 12926, subd. (u).)  Moreover, FEHA places no limitation on what types of reassignments are permissible.  (See Gov. Code, § 12926, subd. (p)(2).)

There are no doubt situations where a request for reassignment away from a coworker would pose an undue hardship for an employer, but we cannot say that such requests are per se unreasonable or that the undisputed facts here establish the unavailability of any reasonable accommodation.[10]

_____

[10]    Like the trial court, JMH believes summary judgment on this claim is appropriate based solely on the generalized conclusion that "requesting to not work with a co-worker is not a reasonable accommodation."  That is, JMH

31

### C. Failure to Engage in the Interactive Process

"Under FEHA, an employer must engage in a good faith interactive process with the disabled employee to explore the alternatives to accommodate the disability." (*Wysinger v. Automobile Club of Southern. California* (2007) 157 Cal.App.4th 413, 424.) "To prevail on a claim for failure to engage in the interactive process, the employee must identify a reasonable accommodation that would have been available at the time the interactive process occurred." (*Nealy, supra*, 234 Cal.App.4th at p. 379.) Liability only exists if a reasonable accommodation was possible. (*Nadaf-Rahrov, supra*, 166 Cal.App.4th at p. 981.)

Here, Birch alleged that JMH failed to timely engage in a good faith interactive process to determine if it could reasonably accommodate her. In granting summary judgment on this claim, the trial court reiterated that a request for reassignment was not a reasonable accommodation and expressed uncertainty as to what liability and damages could arise from a failure to engage in the interactive process where the employee was not entitled to the requested accommodation.

Because the trial court erred in holding that employees are never entitled to a reassignment away from a coworker as an accommodation, the court's rejection of Birch's interactive process claim, which is based on that holding, is likewise in error.

---

does not argue there is evidence conclusively establishing that such an accommodation would in fact unreasonably disrupt JMH's operations or otherwise pose an undue hardship under the rubric set forth in Government Code section 12926, subdivision (u).

## D. Retaliation

To establish a prima facie case of retaliation under FEHA, "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation." (*Ibid.*)

Birch pled that JMH retaliated against her for requesting a reasonable accommodation for her disability. As relevant here, the trial court agreed with JMH that Birch would not be able to establish the third element of her retaliation claim because there was no causal link between her taking medical leaves and her termination. The trial court was correct.

Our review of the record discloses that Birch did not present evidence sufficient to establish a causal link between a protected activity and the employer's action. (See *Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) Though Birch requested and took two leaves of absence before she was ultimately terminated, it is clear these requests were made against the much larger backdrop of a longstanding and escalating feud between Birch and Daniels that required multiple instances of supervisorial intervention. The record contains no indication that these leaves contributed to JMH's ultimate decision to terminate Birch. To the contrary, the evidence shows that Parent

and Juster expressed support for Birch and the steps she was taking to prioritize her mental health.

In contending there was evidence of retaliatory conduct, Birch points to Juster's reference to one of Birch's leaves of absence in the September 2020 verbal counseling record and Juster's reference to the verbal counseling record in Birch's termination notice. We are not persuaded.

Birch is correct that the verbal counseling record stated Birch missed out on opportunities to carry out certain agreed steps to improve communication with Daniels due to a leave of absence. However, when read in context, this single statement does not suggest that Birch's requests for leave served as a basis for JMH's issuance of the disciplinary document. Rather, the document focused on the history of "strained relationships" between Birch and Daniels that began to "negatively impact[] [Birch's] ability to collaborate for patient care." And after mentioning Birch's leave, the document discussed in detail the later incidents and representations by Birch that indicated she was avoiding conversation and collaboration with Daniels. Read in its totality, the verbal counseling record's passing reference to Birch's leave of absence does not support a reasonable inference that JMH retaliated against her for taking such leave. (See *Nazir*, *supra*, 178 Cal.App.4th at p. 283.) As such, the trial court did not err in granting JMH's summary judgment motion on this claim.

## E.     Wrongful Termination

Birch's claim for wrongful termination was based on her claims for discrimination, failure to provide a reasonable accommodation, failure to engage in the interactive process, and retaliation, and the parties agree that the wrongful termination claim rises or falls with these other claims. Having concluded the trial court erred in granting summary judgment on all but the

34

retaliation claim, we conclude the court also erred in granting summary judgment on the wrongful termination claim. (See *Zamora v. Sec. Indus. Specialists, Inc.* (2021) 71 Cal.App.5th 1, 62.)

## F. Defamation

The elements of a defamation claim are: " '(1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.' " (*Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702 (*Issa*).) Because the purportedly defamatory statement must include a provable falsehood, "courts distinguish between statements of fact and statements of opinion" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112) and hold that "mere opinions are generally not actionable [citation], [but] a statement of opinion that implies a false assertion of fact is actionable" (*Issa*, at p. 702; see also *Ruiz v. Harbor View Community. Assn.* (2005) 134 Cal.App.4th 1456, 1471 [opinion actionable only if it could reasonably be understood as declaring or implying actual facts that are capable of being proved true or false].)

"Privilege is an affirmative defense to a claim of defamation." (*Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 492.) Employee complaints about workplace harassment are conditionally privileged under the common interest privilege of Civil Code section 47, subdivision (c), which protects communications concerning job performance that are made without malice. (*Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 368, 369.)

Birch pled that JMH was liable for defamation based on Daniels's accusations in her October 30, 2020 email that Birch made comments about Daniels's hair, that Birch did not see Black Americans as " 'any more than "housekeepers and CNAs," ' " and that she checked Daniels's charts without being asked to do so. Birch also cited Daniels's expressions of concerns

35

regarding the quality of care Birch was giving Black patients, and Daniels's request that action be taken to provide all patients with equitable care and to create a safe environment for staff.

In moving for summary judgment on this claim, JMH argued Daniels's statements regarding the comments Birch supposedly made about Black patients were statements of opinion and not statements of fact. JMH additionally contended that Daniels's statements were made without malice and were therefore privileged under Civil Code section 47, subdivision (c).

The trial court did not address the substance of JMH's contentions but nonetheless granted summary judgment based on its view that a defamation claim against an employer could never be based on statements made to the employer by a nonsupervisory employee about a fellow employee. The court explained its thinking by posing a hypothetical in which two convenience store clerks accuse each other of theft in communications to their employer. Believing the employer would be liable for defamation in that scenario no matter what, the court simply stated, "That can't be right."

On appeal, Birch argues an employer may be held liable for the statements of an employee under the doctrine of respondeat superior. She further asserts that JMH challenged only some of the statements that formed the basis of her defamation claims, that the statements challenged were statements of fact and not opinion, and that a triable issue of fact exists as to whether Daniels made these statements with malice. Birch's contentions are persuasive.

For starters, the trial court cited no legal authority in support of its conclusion that an employer cannot be liable for defamatory statements made by one nonsupervisory employee against another. Nor does JMH identify any authority supporting what it describes as the trial court's "somewhat novel

36

but thoroughly sensible" ground for rejecting the defamation claim. Courts, however, have recognized the possibility of an employer's respondeat superior liability for a defamatory statement made by one of its employees to another employee. (See, e.g., *Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 284 (*Kelly*) [respondeat superior liability applied where the plaintiff's former supervisor told the employer's managing agent and other employees in the personnel office that plaintiff misused company funds and falsified invoices][11]; *Rivera v. National Railroad Passenger Corp.* (9th Cir. 2003) 331 F.3d 1074, 1077, 1080–1081 [employer could be held liable for employee statements to plaintiff's supervisor that plaintiff falsified his time cards and threatened other employees].) We now turn to JMH's contentions that summary judgment was nonetheless appropriate because Daniels's statements about Birch were statements of opinion and not of fact, and because Daniels's statements were made without malice and were therefore privileged under Civil Code section 47, subdivision (c).

As for the nature of Daniels's statements, JMH is correct that "mere opinions are generally not actionable." (*Issa*, *supra*, 31 Cal.App.5th at p. 702.) However, "a statement of opinion that implies a false assertion of fact is actionable." (*Ibid.*) In determining whether a challenged statement is reasonably susceptible of a defamatory interpretation, courts look at the " 'totality of circumstances,' " considering " 'both the language of the statement and the context in which it is made' " to determine the probable effect of a statement to an average reader. (*ZL Technologies., Inc. v. Does 1-7*

---

[11] JMH attempts to distinguish *Kelly* because it dealt with a demurrer and not with a motion for summary judgment. No matter. The *Kelly* court made clear it was setting forth a general principle of law. (See *Kelly*, *supra*, 136 Cal.App.3d at p. 284.)

(2017) 13 Cal.App.5th 603, 624 (*ZL Technologies*).)  Here, Daniels's statements regarding Birch's treatment of Black patients arose in the context of an email that referenced Birch's alleged comments about Daniels's hair, Birch's purported view that Black Americans are no more than " 'housekeepers and CNAs,' " and Daniels's assertion that Birch continued to refuse to "accept and acknowledge her bias."  An average reader could conclude that these statements were not mere expressions of opinion, but an assertion that Birch was, in fact, racist and treating Black patients poorly because of her bias.  (*ZL Technologies*, at p. 624.)  Consequently, such statements could form the basis of a defamation claim.  (*Issa, supra*, 31 Cal.App.5th at p. 702.)

As for JMH's contention that Daniels's statements were not made with malice, the question is whether the record reflects a triable issue of fact on the matter.  Malice may be established by "showing that the publication was motivated by hatred or ill will toward the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and acted in reckless disregard of the plaintiff's rights." (*King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, 701, italics omitted.)  It can also be proved by "direct or circumstantial evidence," such as " 'anger and hostility, and reliance on sources known to be unreliable.' " (*Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 221 (*Mitchell*).)

Here, the evidence shows a history of ongoing conflict after Birch moved Daniels's shoes from a closet in March 2020 and their longstanding difficulties in working with one another.  Viewing the evidence in the light most favorable to Birch (see *Hartford, supra*, 59 Cal.4th at p. 286), one inference that may be reasonably drawn is that Daniels bore anger and hostility against Birch.  (See *Mitchell, supra*, 70 Cal.App.5th at p. 221.)

Moreover, Daniels cited no instances in which she observed Birch treating Black patients inequitably, and her accusation of inequitable patient treatment appeared to be based on her belief that Birch found it difficult to work with her because she is Black. Because it appears uncertain whether Daniels leveled her accusations out of hostility or with reasonable grounds (see *King*, *supra*, 53 Cal.App.5th at p. 701), we may comfortably conclude that a triable issue of fact exists as to whether Daniels made the statements in her October 30 email with malice.

### DISPOSITION

The summary judgment is reversed as to Birch's claims for discrimination, failure to provide reasonable accommodations, failure to engage in the interactive process, and defamation. It is affirmed as to her retaliation claim. Birch shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

_____

Fujisaki, Acting P. J.

WE CONCUR:

_____

Tucher, J.

_____

Petrou, J.

*Birch v. John Muir Health* (A171661)